UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20- |
| | ) | |
| KEITH COUSIN | ) | |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF RELEASE

Defendant Keith Cousin, by his attorney, respectfully requests that this Court release him on pursuant to the Bail Reform Act, 18 U.S.C. § 3142; *United States v. Jessup,* 757 F.2d 378 (1st Cir. 1985); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988). We ask that this District Court uphold the Order of Release entered on March 19, 2020.  Mr. Cousin has rebutted the presumption of detention with evidence that he is a U.S. citizen, has a family home in Lynn where he can reside, an employment and scholastic history and can be relied on to appear in court.

## I.     PERSONAL BACKGROUND, EDUCATION AND EMPLOYMENT

Mr. Cousin proposes that he be released to his mother's home in Lynn, Massachusetts. This is the address that he has lived at most recently, it is outside the city of Boston and away from any of the addresses or individuals associated with this case. Mr. Cousin's mother, Cindy, has come to each of the detention hearings scheduled in this case. She is a long time union employed construction worker, who until recent lay-offs, was working at job sites in South Boston near the courthouse.

After his release from custody in May of 2019, and while living with his mother in Lynn, Mr. Cousin was employed through Industrial Power Group. Attached is a picture of his 2019 W2 Form.  He was also working towards his GED. In fact, just two weeks before his January 28, 2020 arrest in this case, he passed

the reading portion of the test in the highest score range with a score of 623. Attached is a picture of his Pre-High School Equivalency testing packet and his score from a test taken January 15, 2020.

Prior to living in Lynn with his mother, Mr. Cousin was living in Georgia with his then-fiancée. He had relocated there between 2015-2016. In fact, his mother had also planned to retire there and the family had intended to live there long term. While in Georgia, Mr. Cousin was working at a Veteran's cemetery, caring for the grounds. Attached is a picture of his 2017 W2 form from Hire Quest LLC, the temporary agency that placed Mr. Cousin at the job in the cemetery.

Mr. Cousin came back to the Boston area to see his family. It was an incident during that visit that he came to later be charged with murder in the Suffolk Superior Court. Following his acquittal, Mr. Cousin came to live with his mother in Lynn at the address proposed to Court. He began work at PDX from June – August of 2019. Then he worked at McLabor from August of 2019 until September of 2019. He later returned to Mac Labor in January of 2020 and was employed at the time of his arrest.

## II.   CRIMINAL RECORD, NATURE AND CIRCUMSTANCES OF THIS ALLEGATION

Mr. Cousin's criminal record shows only one appearance default, occurring in February 2009 that was removed in April of 2009, over a decade ago. Further, we cannot emphasize enough that Mr. Cousin did not commit murder. On the date in question Mr. Cousin was not in possession of any firearm and did not participate in a murder in any way, to such a degree as the trial judge found him not guilty without letting the case get to the jury. Attached is the Memorandum that led to the Required Finding of Not Guilty entered by Judge Ricciuti in May of 2019. Simply put – there was no evidence that Mr. Cousin possessed a firearm or in any way participated in the murder. It is inappropriate for the court to draw a negative inference from this acquittal.

Mr. Cousin is alleged to have conspired with the co-defendant Rico Perry to rob a Mexican cartel stash house. This stash house was an entirely fictional rouse created by the Government, first through an informant and later through the undercover agent's suggestions. As the Court can see from the probable cause/detention hearing transcript, the investigation did not unfold as the Government anticipated. Notably,

2

neither Mr. Perry nor Mr. Cousin was ever in possession of a firearm, a seemingly necessary component to the robbery of a Mexican cartel. Further, while the Government has eluded to new evidence concerning an unindicted co-conspirator, that person was never seen on the date in question with a firearm. It stretches reality to think that Mr. Cousin had formed the intent to rob a stash house when a) he had never seen the location or been given any address, b) was unarmed and c) made a decision to disengage from the undercover agent.

### III.    MR. COUSIN SHOULD BE RELEASED BECAUSE CONDITIONS WILL REASONABLY ASSURE HIS REAPPEARANCE IN COURT AND THE SAFETY OF THE COMMUNITY.

This Court should follow Judge Bowler's order and release Mr. Cousin with conditions. In this case, the statute creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). However, release is warranted here because there are numerous facts under 18 U.S.C. § 3142(g) that rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Mr. Cousin's appearance in court and the safety of the community.

As the Supreme Court held in *United States v. Salerno*, 481 U.S. 739 (1987), "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Id.* at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further conditions" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98

225, at 7 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

### IV.   THE PRESUMPTION OF DETENTION CAN BE EASILY REBUTTED, AND, ONCE REBUTTED, MUST BE CONSIDERED ALONGSIDE ALL OF THE EVIDENCE THAT WEIGHS IN FAVOR OF RELEASE.

The law is clear that (1) very little is required for a defendant to rebut the presumption and (2) courts must weigh the rebutted presumption against every factor that militates in favor of release before detaining a defendant.

Under First Circuit law, very little is required for a defendant to rebut the presumption of detention. A "charged drug offender" must only "produce some evidence that he does not present a special risk" in order to rebut the presumption. *United States v. Jessup,* 757 F.2d 378, 385-86 (1st Cir. 1985). The defendant bears only the burden of production, not the burden of persuasion, and thus is not required "to *prove* he would not flee . . . he would only have to introduce a certain amount of evidence contrary to the presumed fact." *Id.* at 383, 380 (emphasis in original). So long as the defendant has produced "some evidence" of any of the § 3142(g) factors, then he has met his burden to rebut the presumption. *Id.* at 384. The government bears the burden of *persuasion* at all times. *Id.*

Other circuits have similarly held that a defendant can successfully rebut the presumption of detention simply by producing any evidence that the defendant is not a flight risk or danger to the community, and that the defendant need not produce much evidence to rebut the presumption. *See, e.g. United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986) (holding that a defendant simply needs to produce "some evidence that he will not flee or endanger the community if released."); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (stating that a defendant

4

has a burden of production and only needs "to offer some credible evidence contrary to the statutory presumption"); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (stating that the burden of *persuasion* rests with the government, not the defendant).

### V.     REGARDLESS OF THE PRESUMPTION, MR. COUSIN MUST BE RELEASED BECAUSE THE GOVERNMENT HAS NOT PROVEN THAT THERE ARE NO CONDITIONS THAT WILL REASONABLY ASSURE APPEARANCE AND SAFETY.

Mr. Cousin should still be released because there are conditions that will reasonably assure the safety of the community and Mr. Cousin's appearance in court. A defendant can be detained "[o]nly 'if, after a hearing pursuant to [§ 3142(f)], the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Ploof,* 851 F.2d 7, 9 (1st Cir. 1988) (quoting 18 U.S.C. § 3142(e)). Here, the government has not carried its high burden of proving by clear and convincing evidence that there are *no* release conditions that will reasonably assure the safety of the community. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure Mr. Cousin's appearance in court. Thus he cannot be detained.

Furthermore, under the dramatic pandemic state of emergency facing the prison system, a person who has a home to live in, family to support him and is no risk of flight should be released. The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison people are confined in close proximity to one another and to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater. In

addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped.

Compounding the problem, many people who are incarcerated also have chronic underlying health conditions, like asthma, diabetes, hypertension or HIV, that place them at elevated risk for contracting serious COVID-19. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[1] Our prisons are no different than a cruise ship[2] or nursing home[3] – places where the virus has run rampant. The facilities are an environment in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly jeopardizing the life and safety of the Defendant. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[4] Medical professionals behind bars are sounding the alarm as well. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming*,' N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can."). *See*

---

[1] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[2] Center for Disease Control & Prevention, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020) https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[3] Los Angeles Times, Seattle-area nursing home deaths jump to 13 with COVID-19 and 11 of unknown causes, https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

[4] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

*also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Cornoavirus*, The New Yorker, Mar. 20, 2020.

In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[5] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[6] In the U.S., steps are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the refusing the admission of individuals arrested on non-violent misdemeanor charges. *See, e.g.,* Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall Street Journal (Mar. 22, 2020).

**CONCLUSION**

For these reasons, Mr. Cousin respectfully requests that this Court release him on the conditions ordered by Judge Bowler.

Respectfully submitted,

KEITH COUSIN
By his attorney

*/s/ Jessica P. Thrall*
Jessica P. Thrall
#670412
Federal Defender Office
51 Sleeper Street
5th Floor
Boston, MA 02210
617-223-8061

---

[5] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) at https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[6] *Coronavirus: Iran Temporarily frees 54,000 prisoners to combat spread,* BBC News, (Mar. 3, 2020) https://www.bbc.com/news/world-middle-east-51723398.

**<u>Certificate of Service</u>**

I, the undersigned, hereby certify that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

<div align="center" style="margin-left:40%">

*/s/Jessica P. Thrall*
Jessica P. Thrall
Assistant Federal Public Defender

</div>

March 23, 2020.