# Exhibit 3

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Location information associated with T-Mobile Phone<br>857-346-5716 | )<br>)<br>)  Case No. 19-mj-5397-JGD<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____ District of ____Massachusetts____, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1951 | Hobbs Act |

The application is based on these facts:
Please see attached affidavit of Special Agent Robert Jacobsen, attached hereto.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Robert Jacobsen, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __12/27/2019__

*Judge's signature*

City and state: Boston, Massachusetts              Honorable Judith G. Dein, U.S. Magistrate Judge
*Printed name and title*

CP001136

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Robert Jacobsen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(857) 346-5716**, [with International Mobile Subscriber Identity/Electronic Serial Number **310260072400024**] (the "SUBJECT PHONE"), that is stored at premises controlled by **T-Mobile**, a wireless telephone service provider doing business at 12920 SE 38th Street, Bellevue, Washington. The SUBJECT PHONE is further described in Attachment A.

2. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of cell tower information and other information concerning the SUBJECT PHONE as further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. This affidavit is also made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government information about the location of the SUBJECT PHONE as further described in Attachment C.

4. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since November, 2017. I received 15 weeks of Criminal Investigator training at the Federal Law Enforcement Training Center and 17 weeks of ATF Special Agent training at the ATF National Academy. I was trained in federal criminal law, firearms, and criminal investigation techniques. Since joining ATF, I have investigated federal

firearms violations, including participating in the controlled purchases of firearms, surveillance of firearms traffickers, interviews of suspects, participating in search warrants, and electronic surveillance. I have investigated acts of violent crime and violations of the federal firearms laws, analyzing firearms trace data, cellular phones, and email accounts. Prior to my employment with the ATF, I was employed for approximately two-and-a-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia. For approximately the last year of that employment, I operated as a member of the Special Operations Unit, a full-time SWAT team and Street Crimes Criminal Suppression Unit. I was trained and certified by the Columbus Police Department as a SWAT operator and hold numerous training certificates in domestic and foreign weapon systems, street crimes, criminal narcotic operations, and gang organizations. Prior to joining the Special Operations Unit, I spent approximately one-and-a-half years in a Patrol function, responding to public emergency calls for service, investigating crimes, and testifying in court. I graduated from the Northern Virginia Criminal Justice Academy with Virginia state certifications as a Police Officer and Jail Corrections Officer. I received a Bachelor's of Science Degree from George Mason University.

5.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

CP001138

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951[1] have been committed, are being committed, and will be committed by **KEITH COUSIN**. There is also probable cause that information associated with the SUBJECT PHONE – including historical cell tower information as described in Attachment B and information about the future location of the SUBJECT PHONE as described in Attachment C – will constitute evidence of such crimes.

## PROBABLE CAUSE

7.      The investigation into **COUSIN** was initiated in October of 2019 when a Confidential Informant[2] (the "CI") made ATF Agents aware that **COUSIN** has a history of robberies and was actively and frequently participating in home invasions and robberies in Boston, Massachusetts. The CI advised that **COUSIN** is a member of the Columbia Road street gang who was most recently charged with Murder and found Not Guilty in a jury trial in May of 2019. The CI explained that **COUSIN** is a violent and unpredictable Columbia Road gang

---

[1] 18 U.S.C. § 1951 (the Hobbs Act) prohibits the obstruction of commerce by robbery – *i.e.*, by the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury. I am aware that courts have determined that even illegal commerce counts as commerce for Hobbs Act purposes, and that courts have also found that drug trafficking affects interstate commerce and that the Commerce Clause of the U.S. Constitution gives the federal government the authority to regulate and control the possession and distribution of controlled substances.

[2] The CI has a criminal history that includes prior firearm and drug distribution convictions. On previous occasions, the CI has accurately identified and corroborated events and individuals involved in active criminal investigations. At the direction of law enforcement, the CI has conducted controlled purchases of evidence in conjunction with criminal investigations. The CI is being paid for her/his services and information provided.

3

CP001139

member who has previously committed, and continues to commit, robberies and home invasions in Boston.

8. My investigation into **COUSIN** corroborated the information provided by the CI, in that **COUSIN** is a documented member of the Columbia Road street gang. The Columbia Road street gang uses clothing, colors, and symbols to represent the gang. Like other members of the gang, **COUSIN** bears a "CR" tattoo. According to the Boston Regional Intelligence Center ("BRIC"), there are forty verified members and associates of the gang. Boston Police Department ("BPD") verifies gang members and has verified **COUSIN** has as a member of the Columbia Road street gang. Investigation into **COUSIN** and other members of the Columbia Road gang show a long and violent history of firearms and armed robbery crimes. **COUSIN** was first arrested by BPD in 2000 for Armed Robbery and has been arrested 34 times since then.

9. Further investigation into **COUSIN** corroborated the CI's intelligence that **COUSIN** has a long history of committing robberies and violent acts. A records check of **COUSIN's** criminal history, as kept by the Massachusetts Board of Probation, includes a 2010 conviction for Possession of a Firearm and Possession of Ammunition, a 2008 conviction for Assault and Battery with a Dangerous Weapon, a 2005 conviction for Possession of a Firearm, a 2003 conviction for Possession of a Firearm, a 2002 conviction for Armed Robbery and Assault with a Dangerous Weapon, a 2001 conviction for Breaking and Entering at Night with Intent to Commit a Felony and Larceny, and a 2001 conviction for Unarmed Robbery. In addition to the aforementioned criminal convictions, **COUSIN** has been arrested numerous other times for firearms, robbery, and drug offenses, among other crimes.

10. The CI further explained that **COUSIN** was recently casing for robberies. Based on my training and experience, I know the term "casing" to refer to taking measures to determine

4

the worthiness of a target prior to conducting a robbery and to plan the methods for carrying out such a robbery. The CI explained that **COUSIN** is actively requesting that people locate drug dealers who possess, control, or store money and/or narcotics at a particular location – often known as a "stash house" – and report back to **COUSIN** with the information. The CI further explained that, as recently as October 2019, she/he was requested by **COUSIN** to make such a phone call, attempting to contact a third-party seeking information related to a potential stash house. Based upon the CI's description of **COUSIN's** conduct, and based on my training and experience and my familiarity with **COUSIN's** criminal history and gang activity, the I believe that **COUSIN** is actively seeking targets for robberies involving drugs, drug dealers, and/or drug proceeds.

11.     In addition to police interaction as a result **COUSIN's** aforementioned criminal history, **COUSIN** has been interviewed ("FIO'd") by police on numerous occasions due to his gang affiliation. According to documentation of those FIOs, **COUSIN** closely associates himself with other violent gang members who have criminal histories that also include armed robberies and firearms, among other charges. According to information gathered from the CI, **COUSIN** is related to a Boston-based, Thetford Ave gang member, Damon **STALLINGS**. **STALLINGS** is known by the CI to spend a great deal of time with **COUSIN**. Furthermore, the CI provided information regarding an unreported robbery committed in September 2019, where **STALLINGS** was present when **COUSIN** robbed an individual of money and marijuana at gunpoint. Investigation into **STALLINGS** finds him to be a convicted felon with a criminal history that includes firearm convictions and robbery arrests, among other violent crime arrests.

12.     T-Mobile has produced toll records for **COUSIN**, the owner of phone number 857-346-5716. The phone number is known by the CI to be solely owned and operated by Keith

5

COUSIN. I reviewed toll records for **COUSIN**, from October 1 to November 12, 2019, which contained a total of 2,691 records. These call records were then searched by frequency. **COUSIN's** sixth most frequent contact was Damon **STALLINGS**, who he was in contact with 97 times via the phone associated with phone number 857-417-3497.

13. On October 27, 2019, BPD officers responded to 980 Dorchester Avenue, a T-Mobile store, for report of a robbery.[3] According to the BPD report, victims stated that two black males wearing homemade ski masks robbed the store at gun point, taking fifteen iPhone cell phones. The BRIC cited that in a similar previous incident, on August 20, 2019, a black male robbed the same T-Mobile store of an iPhone. According to BPD police reports, during that robbery the suspects fled in a vehicle bearing license plates registered to **STALLINGS**. The CI stated that **STALLINGS** takes orders from **COUSIN**, who has an extensive history of committing robberies.

14. On October 20, 2019, BPD responded to a home invasion where four black males forced their way into a residence with firearms and zip-tied the occupants (to include children and elderly). One suspect made several threatened to shoot one of the victims in front of his kids, while another suspect collected the victim's cell phones. Wearing latex gloves, the males were in the process of taking cell phones and smart watches away from the victims when officers arrived at the residence. Two suspects were arrested and two fled the scene. Three firearms were recovered from the suspects at the residence. According to BPD Detectives, the description

---

[3] I know that T-Mobile is a company doing business in Washington, the activities and products of which are in and affecting interstate commerce.

6

CP001142

provided for one of the fleeing suspects matches the description of **COUSIN**, to include a detailed account of a chipped tooth, similar to that of **COUSIN**.[4]

15. The CI provided me with **COUSIN's** phone number as (857) 346-5716. The CI explained that she/he believes that number to be owned and used by **COUSIN**. Furthermore, the CI showed me a photo that **COUSIN** sent to the CI in August of 2019, from the phone number, (857) 346-5716. The photo a is picture of **COUSIN** holding a firearm with a large "drum" style magazine, capable of holding a large capacity of bullets. The angle of the photo was taken in a manner as if **COUSIN** took the photo himself, with his own cell phone. I was able to identify **COUSIN** as being the person in the photo by comparing the photo to **COUSIN's** Massachusetts Registry of Motor Vehicles ("RMV") photo. A records check of the phone number, (857) 346-5716, found the carrier to be T-Mobile. Based on the above text message and photo, and on my training and experience, I believe that the phone associated with (857) 346-5716 – *i.e.*, the SUBJECT PHONE – is used by **COUSIN**.

16. Furthermore, records produced by T-Mobile how that the registered subscriber for 857-346-5716 is **COUSIN's** mother, Cindy Cousin. I reviewed the records for 857-346-5716 from October 1 to November 12, 2019, which contained a total of 2,691 records. I found that **COUSIN** had phone calls with 187 different phone numbers in the records provided, many of which **COUSIN** only had contact with once, or a minimal amount of times. Further investigation into **COUSIN's** ten most frequent phone contacts identified subscribers for eight of

---

[4] The CI described COUSIN as having a chipped tooth. A BPD Detective familiar with COUSIN corroborated this description. Based on the independent corroboration of certain information that the CI has provided about COUSIN, I deem that this information – and other information provided by the CI regarding COUSIN – is reliable.

7

CP001143

the ten. Those eight subscribers were found to be family members and known criminal associates.

17.     On November 26, 2019, I met with the CI. At the direction of law enforcement, the CI agreed to make a recorded phone call to Keith **COUSIN** to initiate a conversation regarding **COUSIN's** interest in participating in a potential robbery plan. In my presence, the CI called **COUSIN**, at the phone number 857-346-5716 (the SUBJECT PHONE). **COUSIN** answered the call and explained to the CI that he did not want to talk over the phone and asked the CI to call back from the FaceTime video chat application. I initiated an audio recording device to record the audio conversation between **COUSIN** and the CI while they communicated over FaceTime video chat. The CI then initiated a FaceTime call with **COUSIN**, and **COUSIN** answered the call.

18.     The CI told **COUSIN** that she/he had "a quick scheme" and told **COUSIN**, "I need somebody man." The CI then admitted to **COUSIN**, "I know were not on good terms" but explained that this situation involved money, referring to money as "bread." **COUSIN** asked the CI, "like what?" The CI answered, "like a come up," referring to the potential for a robbery. **COUSIN** responded asking the CI, "What made you call me out of all people, knowing that we ain't on good terms?" The CI answered, "Because I know what you do…" **COUSIN** responded, "I know." **COUSIN** and the CI then began to discuss their past. **COUSIN** then asked the CI more about the robbery information. The CI told **COUSIN** that her/his people were coming into town and "fuckin' with some n****s." **COUSIN** then stopped the CI and explained he was with his people and that he would call the CI back on FaceTime at a later time to "really chop it up, and really have a heart to heart."

8

CP001144

19. On November 27, 2019, the CI informed ATF that she/he had received a FaceTime video call from **COUSIN**, inquiring for more information regarding the previously discussed robbery plan. I subsequently interviewed the CI about the details of that video phone call. The CI told me that **COUSIN** told the CI that he could not stop thinking about what they discussed during their previous phone call, regarding a potential robbery, and wanted more details. The CI further explained that **COUSIN** made the unprompted statement, "if you got this lick for us, let's do it." Based on my training and experience, and that of other agents, I know the term "lick" to be a common slang term used for a robbery. At the direction of law enforcement, the CI explained to **COUSIN** that she/he knew people from out of state who would be coming into town and "had something good lined up." The CI further explained that these people had done this before a couple years ago and it worked out very well, referring to a robbery. The CI also mentioned that it should work out well this time.

20. On December 17, 2019, the CI was directed by law enforcement to call **COUSIN** and attempt to confirm a time of day for a planned controlled meeting between the CI and **COUSIN**. The CI called **COUSIN** via FaceTime at the phone number, 857-346-5716, and **COUSIN** answered the call. **COUSIN** advised the CI that he was in the car with his sister and told the CI she/he could speak freely and without hesitation regarding the content of the conversation. I interviewed the CI about the details of that video phone call.

21. The CI explained to me that **COUSIN** answered the FaceTime call on December 17, 2019, at approximately 1300 hours. The CI told **COUSIN** that she/he wanted to discuss what they had previously spoken about in prior conversations, eluding to discussions about participating in a robbery. **COUSIN** told the CI that he understood the nature of the topic and asked for more details. The CI told **COUSIN** that things were falling into place for the robbery

9

and attempted to arrange for an in-person meeting to discuss further details. **COUSIN** asked the CI how she/he knew the person who was to be planning the robbery. The CI explained a prepared narrative, at the direction of law enforcement, regarding their relationship. The CI explained that the person "had beef" with some of her/his own people and was planning to rob them. **COUSIN** then attempted to seek further information regarding the possible fruits of the robbery. **COUSIN** told the CI, "...so it's like a double-cross," then stating, "that's going to be like taking candy from a baby."

22. Based on the foregoing, I believe that **COUSIN** has been involved in certain robberies affecting interstate commerce and is actively involved with the planning of and attempting to commit additional robberies affecting interstate commerce.

23. Based upon the aforementioned facts, the information disclosed by T-Mobile for the SUBJECT PHONE, particularly cell-site location information for the time period identified in Attachment B and location data for the time period identified in Attachment C, will likely constitute evidence of 18 U.S.C. § 1951. Based on my experience and training, people who own and utilize cell phones, as **COUSIN** does, usually carry their phones on or around their person.

24. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart,

even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information that is often generated and/or collected by cell providers, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

25. Based on my training and experience, I know that T-Mobile can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

26. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

CP001147

## AUTHORIZATION REQUEST

27. Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

28. I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

29. I further request the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment C unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times as directed by the government. The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

30. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of either of the requested warrants, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b)  T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal

investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b). Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Order, the targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

31. Regarding the warrant for future location information as described in Attachment C, I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment C, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information,

CP001149

there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____
Robert Jacobsen
Special Agent
ATF

Subscribed and sworn to before me on December 27, 2019

_____
HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number **(857) 346-5716**, [with International Mobile Subscriber Identity/Electronic Serial Number **310260072400024**] ("the SUBJECT PHONE"), that are stored at premises controlled by **T-Mobile** ("the Provider"), a company doing business at 12920 SE 38th Street, Bellevue, Washington.

## ATTACHMENT B

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the SUBJECT PHONE listed in Attachment A for the time period **August 15 – October 31, 2019**.

   a. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

### II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, of violations of 18 U.S.C. § 1951 involving Keith COUSIN or any coconspirator during the period August 15 – October 31, 2019.

2

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

CP001153

## ATTACHMENT C

All information about the location of the SUBJECT PHONE described in Attachment A for a period of thirty days from the date of service of this warrant, during all times of day and night, including:

1. E-911 Phase II data;
2. GPS data;
3. latitude-longitude data;
4. other precise location information; and
5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from SUBJECT PHONE.

This warrant does not authorize the collection of any content of any communications.

T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Mobile Phone unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.

CP001154