UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     v.

                                      CRIMINAL NO.
                                      20-10071-ADB

KEITH COUSIN and
RICO PERRY,
     Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO COMPEL**
**(DOCKET ENTRY # 182)**

**February 2, 2022**

**BOWLER, U.S.M.J.**

     Defendants Keith Cousin ("Cousin") and Rico Perry ("Perry")
seek disclosures responsive to 35 requests in a May 10, 2021
discovery letter (Docket Entry # 168) including: (1) unredacted
information relative to Bureau of Alcohol, Tobacco, Firearms, and
Explosives ("ATF") reports and documents; (2) Cousin's criminal
history records and related information; (3) communications
between ATF and the Boston Police Department ("BPD") and BPD
reports; and (4) information regarding a confidential informant
("CI").[1]  (Docket Entry # 182).  Cousin and Perry ("defendants")

---

     [1]  The CI is also "a cooperating witness" (Docket Entry #
182-4, ¶ 6), who provided information to ATF Special Agent Robert
Jacobsen ("Agent Jacobsen"), which he documents in an ATF case
initiation report (Docket Entry # 182-2, ¶¶ 2, 12).  The
government refers to a "CI" in one affidavit (Docket Entry # 182-
3) and a "CW" in a later affidavit (Docket Entry # 182-4).
Comparing the substance of the two affidavits (Docket Entry #

submit that the information in one or more requests is: (1)
"material to preparing the[ir] defense" under Fed. R. Crim. P.
16(a)(1)(E) ("Rule 16(a)(1)(E)"); (2) exculpatory and/or
impeachment material under Brady v. Maryland, 373 U.S. 83, 87
(1963) ("Brady"), and Giglio v. United States, 405 U.S. 150, 154
(1972) ("Giglio"); and (3) necessary to challenge "warrant
affidavits" in "Franks motions" (Docket Entry # 182, pp. 17, 27,
33)[2] and to support motion(s) to dismiss (Docket Entry # 182, p.
27) and "motions to suppress the cell phone evidence seized
without a warrant" when "agents" accessed contents of Perry's
cell phone and Cousin's cell phone during their arrest (Docket
Entry # 182, pp. 5, 19).[3]

---

182-3, ¶¶ 7-10) (Docket Entry # 182-4, ¶¶ 6-9), they are the same
individual, which is consistent with the fact that "Cousin and
Perry use the terms 'CW' and 'CI' interchangeably, for present
purposes" (Docket Entry # 182, p. 33, n.16).  The CI is also
referenced by an assigned number, 27698.  (Docket Entry # 182-2,
¶ 12) (Docket Entry # 182-4, ¶ 6).

    [2] Defendants attach two applications, each with a
supporting affidavit, for search warrants of the same cellular
telephone to their motion: the first dated December 27, 2019, and
the second dated January 31, 2020.  (Docket Entry ## 182-3, 182-
4).  The registered subscriber for the telephone is Cousin's
mother.  (Docket Entry # 182-3, ¶ 16).  The CI informed Agent
Jacobsen, the affiant, that Cousin used the phone number.
(Docket Entry # 182-3, ¶ 15).  The *Franks* motions" (Docket Entry
# 182, pp. 17, 27) presumably apply to the "warrant affidavits"
for the cell phone used by Cousin.

    [3] In their 41-page motion, defendants quote L.R. 116.2(a)
and (b)(1) on a single page.  (Docket Entry # 182, p. 6).  Beyond
reciting the language in L.R. 116.2(a) and (b)(1) (Docket Entry #
182, p. 6), defendants do not tie the rule to any specific
request.  In fact, after quoting L.R. 116.2(a) and (b)(1) on page

Relatedly, defendants maintain that one or more requests are relevant and material to defenses they expect to assert, namely, "entrapment, outrageous government misconduct, selective prosecution and enforcement, and vindictive prosecution." (Docket Entry # 182, p. 9).  As set out in the factual background, defendants were unwitting participants in an undercover ATF fictitious sting operation.  An Indictment charges defendants with conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951, and conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846.  (Docket Entry # 17).

In a 57-page opposition, the government addresses the requests and, more broadly, the above defenses as an inadequate basis for the discovery.  (Docket Entry # 190).  After conducting a hearing, this court took the motion (Docket Entry # 182) under advisement.  More than two months later, defendants filed a supplemental memorandum without seeking leave of court.  See L.R. 7.1(b)(3).  Notwithstanding the violation of L.R. 7.1(b)(3), this

---

six, they do not reference either subpart of the Local Rule again in the 41-page motion except for a mistaken reference to "Local Rule 16.2" on page one.  (Docket Entry # 182, p. 1).  Having not developed an argument regarding L.R. 116.2(a) or (b)(1) with respect to any of the 35 requests or to any of the defenses defendants enumerate as a basis for disclosure, the issue of disclosing the requested information in the 35 requests under L.R. 116.2(a) and (b)(1) is waived.  See United States v. Oladosu, 744 F.3d 36, 39 (1st Cir. 2014) ("'[b]ecause the argument is underdeveloped, it is waived'").

court will consider the memorandum given the absence of an objection from the government.

FACTUAL BACKGROUND[4]

In October 2019, ATF initiated an investigation of Cousin based on information the CI provided to Agent Jacobsen and corroborated by a further investigation of Cousin.  (Docket Entry # 182-2) (Docket Entry # 182-3, ¶¶ 6-14) (Docket Entry # 182-4, ¶¶ 6-10).  The case initiation report sets out the information and summarizes Cousin's criminal history.[5]  Relative thereto, the CI informed Agent Jacobsen that Cousin was a member of the Columbia Road street gang and recently released from jail after being "charged with Murder and found Not Guilty in a jury trial

---

[4]  All page numbers refer to the docketed page number in the upper right-hand corner of a filing rather then the page number at the bottom center of the filing.  The factual background addresses a number of defendants' arguments in footnotes.

[5]  The case initiation report (Docket Entry # 182-2) is subject to a number of discovery requests.  The government provided the report to defendants in redacted form.  The redactions mainly consist of BPD investigation numbers and BPD report numbers.  The report describes Cousin's prior criminal history in unredacted form and the description contains mistakes (Docket Entry # 182-2), which defendants emphasize in their motion (Docket Entry # 182, pp. 3, 14-16).  For example, the case initiation report and the first of the two affidavits used to support the application for a search warrant of Cousin's phone describe seven convictions (Docket Entry # 182-2, ¶ 3) (Docket Entry # 182-3, ¶ 9) when, in fact, four of the convictions are juvenile adjudications.  The second affidavit used to support the application for a search warrant of Cousin's phone corrects these errors.  (Docket Entry # 182-4, ¶ 8).

4

in May 2019." (Docket Entry # 182-2, ¶ 2).[6] An Associate

Justice of Massachusetts Superior Court allowed Cousin's motion

for a required finding of not guilty during the May 2019 jury

trial.[7] (Docket Entry # 46-4, p. 1) (Docket Entry # 182-4, ¶ 6).

As stated in the case initiation report, the CI described

Cousin as a violent and unpredictable member of the Columbia

Street gang who previously committed and continues to commit

robberies and home invasions in Boston. (Docket Entry # 182-2, ¶

2) (Docket Entry # 182-3, ¶ 7). Regarding the CI's reference to

home invasions, the report describes an October 20, 2019 home

invasion in which Cousin "is considered a person of interest by

BPD Detectives in this incident."[8] (Docket Entry # 182-2, ¶ 5).

_____

[6] Defendants argue that Agent "Jacobsen misrepresents the homicide charge," and his "attempt to insinuate that Cousin committed the [homicide] crime is misleading and reprehensible." (Docket Entry # 182, p. 15).

[7] Defendants argue that "the BPD wanted to target Cousin due to his exercise of his rights in the murder case [which] is relevant to the claim of vindictive prosecution." (Docket Entry # 182, p. 24).

[8] According to defendants, Agent "Jacobsen asserts that Cousin was involved in [the] October 20, 2019 home invasion." (Docket Entry # 182, p. 14). The government *correctly* states that the foregoing "is not what Jacobsen said" (Docket Entry # 190, p. 31) because he described Cousin in the case initiation report as "a person of interest *by BPD detectives*" (Docket Entry # 182-2, ¶ 5) (emphasis added).
There is, however, a discrepancy in Agent Jacobsen's depiction of Cousin in the case initiation report regarding his involvement in the home invasion (Docket Entry # 182-2, ¶ 5), which defendants propound as a basis to obtain the case initiation report in unredacted form (Docket Entry # 182, pp. 14-15). The depiction reads as follows: "The description provided

In full, the relevant paragraph reads:

> On October 20, 2019, BPD responded to a home invasion (BPD
> Investigation # ████████████) where four black males forced
> their way into a residence with firearms and zip-tied the
> occupants (to include children and elderly). Wearing latex
> gloves, the males were in the process of taking cell phones

for one of the fleeing suspects matches the description of
COUSIN, to include a detailed account of a chipped tooth similar
to COUSIN." (Docket Entry # 182-2, ¶ 5). During an interview
with BPD Detective Sean Deery and BPD Sergeant Detective Eric
Krauss, a victim in the home invasion described one of the two
individuals arrested, Larry Green ("Green"), as having "a chipped
tooth." United States v. Green, Crim. No. 15-10274-IT (D. Mass.
July 8, 2020) (quoting Docket Entry # 79-1, p. 5). Defendants
point out that a government memorandum in the case states that
"'the Victim described one of the perpetrators as having . . . _a
chipped tooth_'" and that "[t]he description given by the Victim
matched the appearance of [Green] when he was taken into
custody.'" (Docket Entry # 182, p. 15) (quoting United States v.
Green, Crim. No. 15-10274-IT (D. Mass. July 20, 2020) (Docket
Entry # 79-1, p. 5)). The BPD arrested Green on October 21,
2019, and Agent Jacobsen filed the case initiation report on
October 24, 2019. (Docket Entry # 182-5, ¶ 2). Defendants
therefore contend the case initiation report is "false," and "the
government _knew_" it was false "because the BPD had already
arrested" Green as the chipped tooth suspect and charged him, not
Cousin, as the person who committed the crime. (Docket Entry #
182, p. 15) (emphasis in original). The two affidavits contain
the same discrepancy and add "BPD detectives" as the source of
the description. (Docket Entry # 182-3, ¶ 14) (Docket Entry #
182-4, ¶ 10).

Defendants overstate the import of the discrepancy. First,
the CI described that Cousin does have a chipped tooth, and a
"BPD Detective familiar with COUSIN corroborated this
description." (Docket Entry # 182-3, p. 7, n.4) (Docket Entry #
182-4, p. 5, n.2). Second, the government filed the
aforementioned government memorandum in July 2020, more than five
months after Agent Jacobsen wrote the second affidavit and more
than eight months after he prepared the case initiation report.
Third, the fact that on October 21, 2019, a few days before Agent
Jacobsen filed the case initiation report, the BPD, a state
entity, arrested Green and internally interviewed the victim, who
described Green as having a chipped tooth, does not mean the
government knew the chipped tooth description in the case
initiation report was false.

and smart watches away from the occupants when officers arrived at the residence. Two suspects were arrested and two fled the scene. Three firearms were recovered from the suspects at the residence. *The description provided for one of the fleeing suspects matches the description of COUSIN, to include a detailed account of a chipped tooth similar to COUSIN. COUSIN is considered a person of interest by BPD Detectives in this incident.*

(Docket Entry # 182-2, ¶ 5) (emphasis added).

Agent Jacobsen's investigation included reaching out to BPD detectives who conveyed that Cousin "has a long criminal history of violent crime, firearm possession, and armed robberies."[9] (Docket Entry # 182-2, ¶ 1).  The case initiation report recites the following:

7. In March of 2009, BPD obtained a warrant for COUSIN for Assault and Battery, and Threats to Commit a Crime (BPD Investigation # ▮▮▮▮▮▮▮▮▮▮).  Upon his arrest and during the booking search, COUSIN was found to have a black ski mask and two gloves with the fingers cut off.

8. In May of 2009, COUSIN was convicted of Assault and Battery with a Dangerous weapon after stabbing a person during a robbery (BPD Investigation # ▮▮▮▮▮▮▮▮▮▮).  BPD police reports state that COUSIN approached the victim on foot, a fight ensued, and COUSIN stabbed the victim before fleeing.[10]

9. In December of 2005, COUSIN was convicted of Possession

_____

[9]  Defendants and the government dispute whether the BPD was part of the ATF investigation and/or acting on the government's behalf.  (Docket Entry # 182, pp. 26-27) (Docket Entry # 190, pp. 42-48).

[10]  As a basis to obtain discovery due to misrepresentations in the case initiation report, defendants correctly point out that the fight took place in jail and did not involve a knife. (Docket Entry # 182, p. 16) (Docket Entry # 190, pp. 34-35).  The government agrees and states it will provide defendants with a copy of the criminal complaint.  (Docket Entry # 190, pp. 34-35).

of a Firearm after BPD officers observed COUSIN carrying a sawed-off shotgun[11] into a vacant lot known for drug activity (BPD Investigation # ██████████ ). At the sight of law enforcement, COUSIN fled on foot and led officers in a foot pursuit through Columbia Road street gang territory before being apprehended.

10. In May of 2002, COUSIN was convicted of Armed Robbery and Assault with a Dangerous Weapon (BPD Investigation # ████ ██████ ).[12] The victim of the robbery who was walking down the street at the time . . . stated that COUSIN, wearing all black, lifted up his shirt revealing a handgun.

11. In November of 2000, COUSIN was convicted of Armed Robbery.[13] BPD police reports (BPD Investigation # ██████████ ) state that COUSIN approached a person on foot, [and] brandished a knife located on his hip before robbing the victim and fleeing the area.

(Docket Entry # 182-2, p. 3).

Agent Jacobsen's investigation corroborated the CI's

depiction of Cousin as a gang member and "further investigation"

---

[11]   Defendants point out that the reference to a "sawed-off shotgun" is an error because the actual weapon was "a rifle." (Docket Entry # 182, p. 16).  They submit the error "inject[s] a false sense of dangerousness and urgency" and complain that "the BPD investigation number is redacted," which "prevent[s] further investigation into both the incident and the false fact." (Docket Entry # 182, p. 16).  The government concedes that Agent Jacobsen made a mistake and represents that the firearm was "'a brown handled rifle which appeared to have the barrel and stock "sawed-off."'"  (Docket Entry # 190, p. 35).  The government aptly reasons that the discrepancy between "Cousin's possession of a sawed-off rifle rather than a sawed-off shotgun" does not "detract from the strong evidence of predisposition" regarding the entrapment defense.  (Docket Entry # 190, p. 36).

[12]   The conviction is, in fact, a juvenile adjudication. (Docket Entry # 182-4, ¶ 8).

[13]   Defendants correctly point out that Cousin was a juvenile at the time, and the "conviction" was a juvenile adjudication. (Docket Entry # 182, p. 16).

corroborated Cousin's long criminal history of committing robberies and violent acts.  (Docket Entry # 182-4, ¶¶ 7-8).  The investigation showed Cousin's first arrest in 2000 as a juvenile for armed robbery and subsequent arrests on 34 charges.  (Docket Entry # 182-4, ¶ 7).  Based on a records check of the Massachusetts Board of Probation, Agent Jacobsen determined Cousin had three convictions and four juvenile adjudications.[14] (Docket Entry # 182-4, ¶ 8).  Specifically, they comprise of:

> 2010 convictions for possession of a firearm and possession of ammunition, a 2008 conviction for assault and battery with a dangerous weapon, . . . a 2005 conviction for possession of a firearm . . . a 2003 juvenile adjudication for possession of a firearm, 2002 juvenile adjudications for breaking and entering at night with intent to commit a felony and larceny, and [a] 2001 juvenile adjudication for unarmed robbery.

(Docket Entry # 182-4, ¶ 8).

Notably, the CI explained to Agent Jacobsen that Cousin was "actively requesting that people locate drug dealers with stash-houses" who possess "money and narcotics, and report back to COUSIN with the information."  (Docket Entry # 182-2, ¶ 12) (Docket Entry # 182-3, ¶ 10).  The CI also informed Agent Jacobsen that Cousin "was recently casing potential targets for robberies."  (Docket Entry # 182-4, ¶ 9).  In fact, the CI "explained that as recently as October 2019," Cousin "requested"

---

[14] As indicted, the case initiation report and the first affidavit mistakenly describe the four juvenile adjudications as convictions.  See fn. 5.

the CI to attempt to contact by telephone "a third party to seek information related to a potential stash house." (Docket Entry # 182-4, ¶ 9) (Docket Entry # 183-3, ¶ 10).[15]

Accordingly, on October 25, 2019, a Group Supervisor in ATF's Boston II Field Office ("the Group Supervisor") authorized the ATF investigation of Cousin.[16] (Docket Entry # 182-2, p. 2). On November 26, 2019, Agent Jacobsen met with the CI, who agreed to place a recorded telephone call to Cousin concerning his interest in participating in a potential robbery. (Docket Entry # 182-3, ¶ 17) (Docket Entry # 182-4, ¶ 11). A FaceTime video

---

[15] Citing paragraph 16 of the first affidavit (Docket Entry # 182-3, ¶ 16), defendants state that "the government was also aware, having reviewed Cousin's phone records, that prior to the initiation of this case, the CI had *not* been in recent contact with Cousin. *See id.* ¶ 16." (Docket Entry # 182, p. 2) (emphasis misleading). Paragraph 16, however, does not establish the government's awareness of the lack of contact from reviewing the phone records. Specifically, paragraph 16 depicts that Agent Jacobsen reviewed telephone records produced by the service provider, which contained "2,691 records . . . with 187 different phone numbers" during the October 1 to November 12, 2019 time period. (Docket Entry # 182-3, ¶ 16). The paragraph further states that "COUSIN only had contact once, or a minimal amount of times" with "many" of the 187 telephone numbers. (Docket Entry # 182-3, ¶ 16). Agent Jacobsen adds that he investigated ten of "most frequent contacts" and identified "eight subscribers" as "family members." (Docket Entry # 182-3, ¶ 16). Paragraph 16 therefore does not state that the CI's phone number was not one of the 187 telephone numbers. Moreover, the relevant statement by the CI is that Cousin "requested" the CI to make a phone call as opposed to "telephoned" the CI to make a phone call. (Docket Entry # 182-1, ¶ 9).

[16] The Special Agent in Charge of ATF's Boston Field Division ("the SAC") reviewed and approved the authorization on the same day. (Docket Entry # 182-2, p. 2).

chat ensued, which Agent Jacobsen recorded using an audio recording device.  (Docket Entry # 182-3, ¶ 17) (Docket Entry # 182-4, ¶ 11).  During the chat, the CI told Cousin that "he/she had 'a quick scheme'" and "'need[ed] somebody.'"  (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12).  The CI referred to the potential of a robbery and admitted to Cousin that "'I know we're not on good terms.'"  (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12).  Cousin then asked the CI why the CI was calling him "'knowing that we ain't on good terms?'"[17]  (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12).  The CI answered, "'Because I know what you do,'" whereupon Cousin replied, "'I know.'"  (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12).  The two "then began to discuss their past." (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12). Cousin then asked the CI for more information about the robbery. (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶ 12).  The CI responded "'that her/his people were coming into town . . .'" Cousin concluded the chat by stating he would call the CI later on FaceTime to "'really chop it up, and really have a heart to heart.'"  (Docket Entry # 182-3, ¶ 18) (Docket Entry # 182-4, ¶

---

[17]   Defendants maintain the CI's above comment ("we're not on good terms") evidences a "personal conflict" and therefore shows the CI "made baseless claims that Cousin was 'casing for robberies.'"  (Docket Entry # 182, p. 2).  Defendants' request 49 seeks to compel "information provided by the CI to the government concerning the reason why he and Cousin were 'not on good terms.'"  (Docket Entry # 168, ¶ 49).

12).

The following day, Cousin initiated an unrecorded FaceTime video chat with the CI.  Cousin stated "he could not stop thinking about what they discussed" previously and wanted more details regarding the potential robbery.  (Docket Entry # 182-3, ¶ 19) (Docket Entry # 182-4, ¶ 13).  During the chat, he made an "unprompted statement, 'if you got this lick for us, let's do it.'"  (Docket Entry # 182-3, ¶ 19) (Docket Entry # 182-4, ¶ 13).  "Lick" is a commonly-used term for a robbery.  (Docket Entry # 182-3, ¶ 19) (Docket Entry # 182-4, ¶ 13).  The CI provided Cousin with additional details about the fictitious plan, specifically, that the CI knew some "people from out of state who would be coming into town and 'had something good lined up.'"  (Docket Entry # 182-3, ¶ 19) (Docket Entry # 182-4, ¶ 13).  On December 17, 2019, the CI initiated a FaceTime call to Cousin and advised him that "things were falling into place for the robbery" and wanted to arrange an in-person meeting.  (Docket Entry # 182-3, ¶ 21) (Docket Entry # 182-4, ¶ 14).  Cousin then asked how the CI knew the person planning the robbery, whereupon the CI explained that the out-of-state "person 'had [a] beef' with some of his/her own people and was planning to rob them."  (Docket Entry # 182-3, ¶ 21) (Docket Entry # 182-4, ¶ 14).

On January 7, 2020, an ATF special agent acting in an undercover capacity ("UC"), the CI, and Cousin met in a vehicle

driven by the CI from Boston Logan airport to a Boston hotel.
(Docket Entry # 182-4, ¶ 15).  During the drive, the UC falsely
described himself as a cocaine courier "for a Mexican-based Drug
Trafficking Organization" ("DTO"), which was seeking to expand
operations into New England.  (Docket Entry # 182-4, ¶ 16).  He
explained that the DTO had stash houses with quality cocaine and
that he was responsible for transporting two kilograms.  Every
time he picked up the cocaine, however, he "observed at least
ten" kilograms of cocaine and the same two guards, one of whom
was armed.  (Docket Entry # 182-4, ¶ 16).  At this point, Cousin
interjected, "'[p]lay it like they both got guns'" and then
directed the UC to continue his explanation.  (Docket Entry #
182-4, ¶ 17).  After providing additional details, the UC
articulated his motivation for the robbery as the DTO's failure
to pay him for the last two transports and making him travel from
Texas to Massachusetts.  Cousin acknowledged his understanding
and told the UC he could not have picked anyone better than
himself to perform the robbery.  (Docket Entry # 182-4, ¶¶ 18-
19).  At one point during the meeting, Cousin asked the UC "how
you want it to be done?"  (Docket Entry # 190, p. 10) (quoting
recorded transcription of conversation).[18]  In response, the UC

_____

[18]  Defendants did not challenge the accuracy of the
government's representation of the conversation in the
supplemental memorandum (Docket Entry # 198) or at the hearing.
Both the government and defendants cite and quote discovery
material that neither include as an exhibit to their filings to

replied, "No, no, no, no, it's about how you want to do it."
(Docket Entry # 190, p. 11) (quoting recorded transcription of
conversation).[19]  Cousin also addressed the manner of the
robbery, preferring to stage a fake robbery of the UC after he
left the stash house with the two kilograms of cocaine.  (Docket
Entry # 190, p. 11) (quoting recorded transcription of
conversation).[20]  Cousin eventually indicated "it sound[ed]
right" to rob the stash house of "everything."  (Docket Entry #
190, p. 11) (quoting recorded transcription of conversation).[21]

A second meeting took place the following day during which
the UC and the CI met with Cousin and Perry, introduced "as 'E.'"
(Docket Entry # 182-4, ¶ 20).  During the meeting in a hotel
room, the UC asked Perry if Cousin had informed him about "'what
was going on,'" to which Perry replied "briefly."  (Docket Entry
# 182-4, ¶ 21).  The UC then proceeded to reiterate the
previously described false narrative, and Perry acknowledged he
understood the UC's explanation.  After the UC explained his
motivations for the robbery, Cousin stated to Perry that the

_____

support or oppose the motion to compel.  (Docket Entry ## 182,
190, 198).  Subject to a few exceptions noted in this and other
footnotes, the factual background is culled from the exhibits the
parties filed as opposed to the allegations in their briefs.

[19]  See the previous footnote.

[20]  See footnote 18.

[21]  See footnote 18.

meeting was necessary and that, "'[i]f you ain't planning, you planning to fail,'" whereupon Perry agreed.  (Docket Entry # 182-4, ¶ 23).  The UC suggested splitting the robbery's proceeds "'fifty-fifty'" to which Cousin replied, "'Of course.'"  (Docket Entry # 182-4, ¶ 23).  The group also discussed the manner of the robbery.  Cousin reiterated his opinion of robbing the UC of the two kilograms after he exited the stash house whereas Perry preferred to enter the stash house, put a gun to the first guard's head, and take the guard hostage.  (Docket Entry # 182-4, ¶ 26).  In response to the UC's need for reassurance that the stamped cocaine would not be sold on the streets with the stamp, Perry noted he would convert the cocaine into crack.  (Docket Entry # 182-4, ¶ 27).  Cousin responded he would not be robbing someone of "'drugs' if he did not have the means to distribute them."  (Docket Entry # 182-4, ¶ 27).  Upon being asked by Perry if the cocaine was "'pink,' 'crystals' and 'flake'" inside the kilogram, the UC stated it "was 'fish scale,'" a commonly-used term denoting "very high-quality cocaine," to which Cousin and Perry laughed.  (Docket Entry # 182-4, ¶ 27).  Cousin also stated the job would require "'machine guns' and a third member with a 'handgun.'"  (Docket Entry # 182-4, ¶ 28).

On the evening of January 27, 2020, the UC initiated a recorded telephone call to Cousin and informed him the robbery would take place the next day and the target was in the East

15

Boston area.  (Docket Entry # 182-4, ¶ 30).  The following morning, Cousin telephoned the CI and asked where they would meet, to which the UC responded in a parking lot at a Hilton Garden Inn in Boston.  (Docket Entry # 182-4, ¶ 31).  A few minutes after the UC and the CI arrived in the parking lot shortly before noon, Cousin called the CI and told him he had "observed law enforcement at the location."  (Docket Entry # 182-4, ¶ 32).  He further stated he did not want to meet there or in a public location and asked the UC to pick a new location.  (Docket Entry # 182-4, ¶ 32).  Ten minutes later, the UC placed a recorded telephone call to Cousin suggesting they meet at CubeSmart Self Storage ("CubeSmart") in Boston.  (Docket Entry # 182-4, ¶ 33).  Cousin expressed reluctance but eventually agreed, and the UC provided him the address.  (Docket Entry # 182-4, ¶ 33).

The UC and the CI arrived first at the new location in an undercover vehicle ("UV") and Cousin and Perry arrived a short time later in Cousin's Honda.  (Docket Entry # 182-4, ¶ 34).  After Cousin and Perry exited the Honda and made contact with the UC and the CI, Cousin elaborated that he and Perry had seen law enforcement on the street at the Hilton Garden Inn in a black Ford sport utility vehicle and, after Cousin first notified the UC, the "vehicle was no longer present."  (Docket Entry # 182-4, ¶¶ 35-36).  The UC proceeded to ask Cousin and Perry if they were

ready and had their guns.  Cousin and Perry indicated they were
ready and, in response to the UC's question whether they would be
the only ones conducting the robbery, Cousin replied there was
another "crew member, who was the 'driver'" and had the firearms.
(Docket Entry # 182-4, ¶ 36).  The UC insisted the driver needed
to come to their location so that everyone could be together.
Cousin and Perry expressed reluctance and disputed the need for
the driver to meet them at CubeSmart.  (Docket Entry # 182-4, ¶
36).

Due to the cold weather, the group entered the UV.  Perry
then asked the UC a question regarding the type of building and,
after the UC responded, Perry asked the UC why his "beanie cap"
looked as if "it had a brim inside of it" and stated he wanted
the UC to give him "the beanie so he could look at it."  (Docket
Entry # 182-4, ¶ 37).  The UC removed the beanie cap from his
forehead but refused to give it to Perry, who was displeased.
(Docket Entry # 182-4, ¶ 37).  Perry and Cousin then exited the
UV.  The UC followed and stated he "wanted to make sure they were
'cool,'" to which Perry replied "'yeah.'"   (Docket Entry # 182-
4, ¶ 37).  The UC then stated he "just want[ed] you guys to be
cool with it, and if you not, then you not.  You know, like?
It's up to you guys . . ."[22]  Cousin responded, "We cool."

_____

[22]  In addition to Cousin and Perry's expressed concern about
law enforcement's presence at the Hilton Garden Inn, Perry's
expressed suspicion about the beanie cap and exiting the vehicle

(Docket Entry # 182-4, ¶ 37).  Perry and Cousin, however, returned to Cousin's Honda and departed from CubeSmart.  (Docket Entry # 182-4, ¶ 37).  Three minutes later, the UC placed a recorded telephone call to Cousin and asked "if they were 'good.'"  (Docket Entry # 182-4, ¶ 38).  Cousin stated he was getting the third crew member and would return shortly.  The UC then stated, "'If you all still with it, grab your mans and come back.  If not, it's all good, you feel me?'"  (Docket Entry # 182-4, ¶ 38).  Cousin replied, "'Yeah.'"  (Docket Entry # 182-4, ¶ 38).  Cousin and Perry then left the facility in Cousin's Honda.  (Docket Entry # 2-1, ¶ 27).

Cousin and Perry returned to CubeSmart approximately 20 minutes later, the UC and the CI exited their vehicle, and Cousin stated they no longer needed the third crew member because there had been "too much 'confusion.'"  (Docket Entry # 182-4, ¶ 39).  Perry then returned to the subject of the UC's beanie cap and stated "'a regular skully is flat'" but the UC's beanie "had a 'bulge.'"  (Docket Entry # 182-4, ¶ 40).  The UC explained "it was just an emblem," but Perry continued to express his concern.  (Docket Entry # 182-4, ¶ 40).  The UC, the CI, Cousin, and Perry then entered a storage unit.  (Docket Entry # 182-4, ¶ 41).  Cousin stated "he and Perry had 'bad nerves,' especially because

with Cousin are relevant to the entrapment defense as is the above statement by the UC.

18

of his earlier observation of the law enforcement vehicle."
(Docket Entry # 182-4, ¶ 41).  Cousin and Perry then unzipped
their jackets, removed their pants below the waist lines, and
lifted their shirts to demonstrate "they did not have anything on
them" such as "'wires' or recording devices."  (Docket Entry #
182-4, ¶ 41).  The UC "proceeded to do the same" and also
"turn[ed] the front part of his beanie inside out" in order for
Cousin and Perry to "see there was nothing behind it."  (Docket
Entry # 182-4, ¶ 41).  Perry and Cousin acknowledged "there was
nothing concealed in the" beanie, and Cousin "stated that made
him feel 'so much better.'"  (Docket Entry # 182-4, ¶ 41).  Perry
agreed and declared, "I ain't going nowhere.  We'll get the job
done.'"  (Docket Entry # 182-4, ¶ 41).

The group then left the storage unit.  (Docket Entry # 2-1,
¶ 29) (Docket Entry # 182-4, ¶ 42).  The UC again asked about the
third crew member, and Perry proceeded to have a telephone
conversation with "'Trick.'"  (Docket Entry # 182-4, ¶ 42).  When
the conversation ended, Perry stated to Cousin that they needed
to go "grab him," referring to "'Trick.'"  (Docket Entry # 182-4,
¶ 42).  Cousin and Perry explained to the UC "that they wanted to
take the rental vehicle to pick up the 'driver' and guns."
(Docket Entry # 2-1, ¶ 29).  As Cousin and Perry "began to
attempt to enter" a secondary undercover vehicle, the UC gave an
arrest signal.  (Docket Entry # 182-4, ¶¶ 42-43).  Members of an

ATF special response team ("SRT") exited one the storage units in order to arrest Cousin and Perry. One or more members of the SRT team deployed a noise flash diversionary device and non-lethal projectiles striking Perry and Cousin, who went to the ground. An SRT member then pressed Perry's thumb on an Apple iPhone to gain access to the contents. (Docket Entry # 182, p. 5) (citing CP001081-82).[23] SRT members also recovered Cousin's telephone. (Docket Entry # 182-4, ¶ 43). The SRT team arrested Perry and Cousin and took the two into custody. (Docket Entry # 182-4, ¶ 43). ATF had arranged for an ambulance on the scene. (Docket Entry # 182, p. 18) (Docket Entry # 190, p. 36). At Perry's request, he was transported to a hospital.[24]

Less than two weeks before his arrest, Cousin completed a Massachusetts Adult Proficiency Test in reading. He scored in the highest range. (Docket Entry # 46-3). In 2019, he worked at a business in Needham, Massachusetts. (Docket Entry # 46-1).

<u>DISCUSSION</u>

As noted, defendants maintain the requested information is material under Rule 16(a)(1)(E); exculpatory under <u>Brady</u>, 373 U.S. at 87, as well as impeachment material under <u>Giglio</u>, 405

---

[23] The government did not challenge defendants' representation at the hearing. <u>See</u> fn. 18.

[24] Defendants represent, and this court accepts solely for purposes of resolving the motion, that Perry received treatment for injuries from the nonlethal "projectile to the back of his head." (Docket Entry # 182, pp. 5, 18).

U.S. at 154; and necessary "for <u>Franks</u> motions" as well as "motions to suppress evidence and to dismiss." (Docket Entry # 182). Defendants emphasize the need for the information "to assert the defenses of entrapment, outrageous government misconduct, selective prosecution and enforcement, and vindictive prosecution." (Docket Entry # 182, pp. 9-13). Accordingly, prior to examining the 35 requests, this court examines the bases for the discovery and these defenses.

I.   <u>Rule 16(a)(1)(E)</u>

Rule 16(a)(1)(E) requires the government, upon request, to allow a defendant to inspect or copy "papers, documents, [and] tangible objects" that are "material to preparing the defense" if they are "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). A showing of materiality under Rule 16(a)(1)(E) necessitates "'some indication' that pretrial disclosure of the information sought 'would have enabled the defendant significantly to alter the quantum of proof in his favor.'" <u>United States v. Goris</u>, 876 F.3d 40, 44 (1st Cir. 2017) (citation omitted). The rule necessitates "'disclosure of inculpatory and exculpatory evidence alike.'" <u>United States v. Murray</u>, Case No. 3:18-cr-30018-MGM, 2019 WL 1993785, at *2 (D. Mass. May 6, 2019) (citations omitted); <u>see</u> <u>United States v. Smith</u>, Criminal No. 16-cr-91-01-JL, 2017 WL 11461003, at *7 (D.N.H. Oct. 18, 2017)

(citing Ninth Circuit and District of Columbia Circuit decisions).  Reports and "other internal government documents made by a government attorney" or government agent investigating the case are not subject to production under Rule 16(a)(1)(E). See Fed. R. Civ. P. 16(a)(2); Fed. R. Civ. P. 16(a) advisory committee's note to 2013 amendment ("amendment makes it clear that a defendant's pretrial access to. . . documents under Rule 16(a)(1)(E) remains subject to the limitations" in Rule 16(a)(2)).  The defendant "bears the burden of showing materiality." Goris, 876 F.3d at 45 (citations omitted).  When a defendant grounds a discovery request "in a speculative theory," the district court does not abuse its discretion in denying the request.  Id.  Production of Rule 16(a)(1)(E) material is required within 28 days of arraignment.  L.R. 116.1(c)(1)(A).

II.  <u>Exculpatory Evidence under Brady</u>

<u>Brady</u> requires the prosecutor "'to disclose evidence in its possession that is *favorable* to the accused and *material* to guilt or punishment.'" <u>United States v. Simon</u>, 12 F.4th 1, 51 (1st Cir. 2021) (emphasis added and citation omitted).  "The government is primarily responsible for deciding what evidence it must disclose to the defendant under *Brady*." <u>United States v. Prochilo</u>, 629 F.3d 264, 268 (1st Cir. 2011) (citation omitted). <u>Brady</u> applies only "to material that was known to the prosecution but unknown to the defense." <u>United States v. Bender</u>, 304 F.3d

161, 164 (1st Cir. 2002); see United States v. Rodriguez, 162
F.3d 135, 147 (1st Cir. 1998) ("government has no Brady burden
when the necessary facts for impeachment are readily available to
a diligent defender, as they were here").

Favorable evidence includes not only exculpatory information
but also "impeachment evidence that is relevant either to guilt
or punishment." United States v. Tsarnaev, 968 F.3d 24, 73–74
(1st Cir. 2020) (citing United States v. Bagley, 473 U.S. 667,
674-76 (1985), and Giglio, 405 U.S. at 154), cert. granted, 141
S.Ct. 1683 (U.S. Mar 22, 2021) (No. 20-443); United States v.
Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015) ("[e]vidence is
favorable to the accused if it is either exculpatory or
impeaching in nature"). Materiality entails considering "the
favorable, undisclosed evidence along with the evidence presented
at trial, and determin[ing] whether it 'could reasonably be taken
to put the whole case in such a different light as to undermine
confidence in the verdict.'" DeCologero v. United States, 802
F.3d 155, 161 (1st Cir. 2015) (quoting Kyles v. Whitley, 514 U.S.
419, 435 (1995)). Evidence is "material if there is a reasonable
probability that, had it been disclosed, the result of the
proceeding would have been different." Cruz-Feliciano, 786 F.3d
at 87 (internal quotation marks and citation omitted). "'A
reasonable probability does not'" require "'that the defendant
"would more likely than not have gotten a different result with

23

the evidence," only that the likelihood of a different result is great enough to "undermine confidence"' in the proceeding's outcome." Tsarnaev, 968 F.3d at 74 (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)) (internal brackets omitted); accord United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014) (quoting Cain, 565 U.S. at 75). By way of example, evidence regarding a witness's testimony is not material when it has "no substantial value for the government's proof of the defendant's guilt under that evidentiary theory." United States v. Mehanna, Criminal No. 09-10017-GAO, 2018 WL 3084057, at *3 (D. Mass. June 21, 2018). "Withheld information is material under *Brady* only if it would have been admissible at trial or would have led to admissible evidence." Id. at 162 (citation omitted).

Materiality in the context of undisclosed impeachment evidence considers "'the strength of the impeachment evidence and the effect of its suppression in the context of the entire record.'" United States v. Flores-Rivera, 787 F.3d 1, 9 (1st Cir. 2015) (citation omitted). "Evidence is immaterial" that "impeaches a witness on a collateral issue" or "has little probative value" because "additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached." Paladin, 748 F.3d at 444 (citations omitted). Withholding evidence "whose impeachment value is merely marginal is manifestly insufficient to place the trial

24

record in 'such a different light as to undermine confidence in
the verdict.'"  Id. (citation omitted).  Likewise, suppressed
evidence regarding the government's failure to investigate a
connection between a third-party and a murder, in which the
defendant played a role and which served as a basis for predicate
acts underlying the defendant's violations of the Racketeer
Influenced and Corrupt Organizations Act, was not *material* given
the strength and the corroboration of the evidence against him
and the inadmissibility of the suppressed evidence.  DeCologero,
802 F.3d at 159, 163-65.

It is also well settled that the government's disclosure
"obligations under *Brady* only extend to information in its
possession, custody, or control."  United States v. Hall, 434
F.3d 42, 55 (1st Cir. 2006).  Simply stated, "'[w]hile a
prosecutor must disclose information maintained by government
agents even if the prosecutor . . . does not possess the
information, this duty does not extend to information possessed
by government agents not working with the prosecution.'"  United
States v. Rivera-Rodriguez, 617 F.3d 581, 595 (1st Cir. 2010)
(quoting Hall, 434 F.3d at 55).

The government's duty does not require disclosure of
information possessed by a separate sovereign conducting its own
investigation and not acting on behalf of the federal government.
See Moreno-Morales v. United States, 334 F.3d 140, 146-147 (1st

Cir. 2003); United States v. Cadden, Crim. No. 14-10363-RGS, 2015
WL 5737144, at *2 (D. Mass. Sept. 30, 2015).  In Moreno-Morales,
the Puerto Rico Senate was conducting an independent
investigation and "not acting on behalf of the federal
government."  Moreno-Morales, 334 F.3d at 146.  Thus, even though
"federal prosecutors may have observed some of the questioning
and may have reopened their investigation as a result of what
they learned in the hearings, the notes of the Senate hearings
were under seal and there [was] no evidence that they were turned
over to federal prosecutors."  Id.  "Principles of federalism"
therefore led the court to conclude that "'the state's knowledge
and possession of potential impeachment evidence cannot be
imputed to a federal prosecutor for purposes of establishing a
Brady violation.'"  Id. at 146-147; see, e.g., Cadden, 2015 WL
5737144, at *2 (agreeing that "'materials in the possession of
state agencies are generally not in the federal government's
possession, custody, or control,'" absent a showing of a joint
investigation in which each sovereign agreed to act as the agent
of the other") (citing Bender, 304 F.3d at 163-64).

III.  Motions to Suppress and Pursuant to Franks

    Insofar as defendants seek discovery to ferret out
information to support a hearing under Franks v. Delaware, 438
U.S. 154 (1978), a Franks hearing focuses on the existence of
incorrect information in an affidavit to support a warrant.  See

26

generally United States v. O'Neal, 17 F.4th 236, 244 (1st Cir.
2021).  "[A] defendant is entitled to a Franks hearing only if he
first makes a 'substantial preliminary showing,'" id., and
"'[t]he requirement of a substantial preliminary showing should
suffice to prevent the misuse of a veracity hearing for purposes
of discovery or obstruction.'"[25]  United States v. Moon, Criminal
Action No. 11-10223-DJC, 2011 WL 6935340, at *2 (D. Mass. Dec.
30, 2011) (quoting Franks, 438 U.S. at 170).

In light of the preliminary showing and the admonition to
prevent using the hearing to obtain discovery, "Franks does not
itself suggest that the Government has a discovery or disclosure
duty."  Id. (citing Franks, 438 U.S. at 155-56, 164-65, 170-71).

---

[25]  The substantial preliminary showing requires the
defendant to show:

> that a false statement knowingly and intentionally, or with
> reckless disregard for the truth, was included by the
> affiant in the warrant affidavit.  In addition, for the
> defendant to be entitled to relief, the allegedly false
> statement must be necessary to the finding of probable
> cause.

United States v. Centeno-González, 989 F.3d 36, 50 (1st Cir.
2021) (internal citations, brackets, and quotation marks
omitted).  An omission of material fact is also "sufficient to
trigger a hearing."  United States v. Silva, 742 F.3d 1, 8 (1st
Cir. 2014) (citation omitted).  The twofold substantial
preliminary showing relative to an omission requires showing that
the "'omission was made knowingly and intentionally or with
reckless disregard for the truth.'"  Id. (ellipses omitted).
Evidence obtained "through a challenged warrant" is subject to
suppression "at a Franks hearing 'only if the warrant
application, . . . clarified by disclosure of previously withheld
material, no longer demonstrates probable cause.'"  Id.

Whereas <u>Franks</u> itself does not impose a discovery duty on the government, "information that casts doubt on the accuracy of the information in the search warrant affidavit may 'cast doubt on the admissibility of evidence the government anticipates offering in its case-in-chief,' i.e. the fruits of the search." <u>United States v. Jordan</u>, Criminal No. 09-10139-JLT, 2010 WL 625280, at *3 (D. Mass. Feb. 23, 2010) (citation omitted); <u>see</u> L.R. 116.2(b)(1)(B). Moreover, because the identified falsehood or omission must be necessary to the finding of probable cause to impact the fruits of the search, <u>see Silva</u>, 742 F.3d at 8 (defendant's substantial preliminary showing must demonstrate "that the identified falsehood or omission 'was necessary to the finding of probable cause'") (citation omitted), discovery of a falsehood or omission that is immaterial or unnecessary to the probable cause finding does not cast doubt on the admissibility of the government's evidence "in its case-in-chief and that could be subject to a motion to suppress." L.R. 116.2(b)(1)(B). It is also well settled that "[a] <u>Franks</u> hearing does not test the credibility of an informant, rather it is addressed to the veracity and care of the affiant." <u>United States v. Monell</u>, Criminal No. 12-10187-FDS, 2013 WL 12437912, at *3 (D. Mass. Feb. 12, 2013) (citing <u>United States v. Manning</u>, 79 F.3d 212, 220 n.7 (1st Cir. 1996)).

IV.  <u>Entrapment</u>

Entrapment requires a defendant to show: "'(1) government inducement of the criminal conduct; and (2) an absence of predisposition on the part of the defendant to engage in the criminal conduct.'" Boudreau v. Lussier, 901 F.3d 65, 74 (1st Cir. 2018) (quoting United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015)).  It entails *more* than providing the defendant "'an opportunity to commit a crime' through a 'sting' operation." United States v. Pérez-Rodríguez, 13 F.4th 1, 17 (1st Cir. 2021) (citation omitted).  In fact, "'sting operations by their nature often involve government manipulation, solicitation, and, at times, *deceit*'" but "'ordinarily do not involve improper inducement.'" United States v. Sandoval, 6 F.4th at 101 (quoting United States v. Teleguz, 492 F.3d 80, 84-85 (1st Cir. 2007), in parenthetical) (emphasis added).

Inducement thus involves "'"a plus factor" of government overreaching.'" United States v. Salinas-Acevedo, 863 F.3d 13, 17 (1st Cir. 2017) (citations omitted).  Providing "'an "opportunity" <u>plus</u> something else'" typically involves "'excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive.'" Pérez-Rodríguez, 13 F.4th at 17 (citations omitted).  Examples "'of a "plus" factor that raise[] concerns of government overreaching,' . . . include 'intimidation, threats, or dogged insistence.'" United States v. Roszkowski, 700 F.3d

29

50, 54 (1st Cir. 2012) (citations and internal brackets omitted).
Whereas "promises of extravagant reward" may support inducement,
United States v. Acosta, 67 F.3d 334, 338 (1st Cir. 1995), "the
opportunity for a big score," i.e., "over $50 million," or "the
prospect of illicit gain" does not constitute improper
inducement.[26] United States v. Turner, 501 F.3d 59, 64, 71 (1st
Cir. 2007) (citing United States v. Sanchez-Berrios, 424 F.3d 65,
78 (1st Cir. 2005)).  Relatedly, financial distress does not
alone render repeated opportunities "to commit a crime improper"
inducement.  Salinas-Acevedo, 863 F.3d at 15-17 (citation
omitted).  "'It is also important to distinguish between
initiating contact with someone versus suggesting that they
commit a crime.'"  United States v. Saemisch, 18 F.4th 50, 60-61
(1st Cir. 2021) (citation omitted).

The second element, predisposition, focuses on "'whether the
defendant was an unwary innocent or, instead, an unwary criminal
who readily availed himself of the opportunity to perpetrate the
crime.'"  Id. at 61 (quoting Mathews v. United States, 485 U.S.
58, 63 (1988)).  "'A defendant predisposed to commit a crime
should not get off merely because the government gave the
defendant too forceful a shove along a path that the defendant

---

[26]    The above principle weakens defendants' argument that
the UC offered defendants an "'extravagant reward' by stating
that the proceeds would be split fifty-fifty."  (Docket Entry #
182, p. 11).

would readily have taken anyway.'"  Id. (citation and internal
brackets omitted); see United States v. Luisi, 482 F.3d 43, 52
(1st Cir. 2007) ("entrapment defense only deters government
misbehavior in cases where the defendant would otherwise be
law-abiding") (citing United States v. Gendron, 18 F.3d 955, 962
(1st Cir. 1994)).  Although "'the defendant's response to the
government's inducement may be relevant,'" the "inquiry focuses
on the defendant's predisposition before contact with the
government." Saemisch, 18 F.4th at 61 (citation omitted).  With
respect to the import of a defendant's criminal record, a
criminal record of drug dealing "would not be enough by itself"
to allow a jury to find predisposition for the defendant to
commit a firearms possession offense.  Acosta, 67 F.3d at 339.
Because "drug dealing is often associated with access to
weapons," a prior criminal record of crimes (drug dealing
offenses) associated with the charged offense (firearms
possession) is nevertheless relevant to a defendant's
predisposition to commit the charged offense along with other
evidence, for example, the defendant's failure to rebuff the
government's "initial overture."  Id.

Here, the evidence of inducement is relatively weak.[27]  It

---

[27]  The evaluation of the strength of the government's case
and the evidence regarding entrapment and defendants' other
defenses as well as the findings in this opinion are made *only*
for purposes of resolving the motion to compel.  They are *not*
intended to apply, govern, or effect any future motion or

is not, however, absent in light of the repeatedly expressed concern by defendants of law enforcement's presence at the Hilton Garden Inn and the UC's beanie cap.  Conversely, the CI and the UC neither threatened nor intimidated defendants to participate in the robbery.  Instead of rebuffing the government's initial November 26, 2019 overture, Cousin initiated a FaceTime video chat with the CI the next day during which Cousin stated "that he could not stop thinking about what they discussed."  (Docket Entry # 182-4, ¶ 13).  In response to Cousin's January 7, 2020 query asking the UC "'how [he] want it to be done,'" the UC's statement "'[n]o, no, no, it's about how you want to do it'" (Docket Entry # 190, p. 10) (quoting recorded transcription of conversation)[28] shows a lack of government overreach.  The UC did not promise or emphasize the greater financial reward of a robbery of ten kilos inside the stash house versus the lesser financial reward of a fake robbery of two kilos outside the stash house.  Contrary to defendants' argument,[29] it is doubtful that a potential robbery of ten kilos of cocaine presents an extravagant reward.  See Turner, 501 F.3d at 71.  Without something more, the UC's presentation of the opportunity of a robbery of ten kilos with two guards and the CI's initiation of several telephone

proceedings, including a motion to suppress or to dismiss.

[28]   See footnote 18.

[29]   See footnote 26.

calls falls substantially short of inducement.  See
Pérez-Rodríguez, 13 F.4th at 17 (need something more than
opportunity to commit crime through sting operation); accord
Sandoval, 6 F.4th at 101 (quoting Teleguz, 492 F.3d at 84-85, in
parenthetical).

After Perry first asked about the UC's beanie cap on the day
of the staged robbery and defendants exited the UV, the UC asked,
without engaging in threats, if defendants were still "'cool'"
with the robbery.  The UC then reduced any inducement by giving
defendants a choice stating, "'I just want you guys to be cool
with it, and if you not, then you not . . . It's up to you
guys.'"  (Docket Entry # 182-4, ¶ 37).  Defendants' reluctance
because they observed law enforcement at the Hilton Garden Inn
and because of the beanie cap's shape evaporated not because of
any force or intimidation by the UC.  Rather, in response to
defendants' unzipping their jackets and lifting their shirts, the
UC did the same and turned the beanie cap inside out.  Perry then
voiced his desire to "'get the job done,'" and Cousin stated the
UC's conduct "made him feel 'so much better.'"  (Docket Entry #
182-4, ¶ 41).

The evidence of predisposition is relatively strong.[30]
Focusing on Cousin's predisposition prior to the government's
November 26, 2019 contact, Cousin was already "actively

_____

[30]   See footnote 27.

requesting that people locate drug dealers with stash-houses" who possess money and/or narcotics and then having such people "report back to COUSIN."[31]  (Docket Entry # 182-2, ¶ 12) (Docket Entry # 2-1, ¶ 7) (Docket Entry # 182-4, ¶ 9).  In October 2019, Cousin "requested" the CI "to make such a phone call."  (Docket Entry # 182-4, ¶ 9).

Perry also faces a difficult showing.  Although he expressed repeated concerns regarding the CI's beanie cap, ultimately he decided he would "'get the job done.'"  (Docket Entry # 182-4, ¶ 41).  Moreover, Perry likely needs to show derivative entrapment because the government did not reach out to Perry, rather, Cousin introduced Perry to the CI and the UC at the Boston hotel on January 8, 2020.  See United States v. Rivera-Ruperto, 846 F.3d 417, 429 (1st Cir. 2017) (defendant "did not deal directly with the government agent and "was brought into the drug deal by a middleman" thus requiring defendant to satisfy five requirements to attribute middleman's conduct to the government).[32]

---

[31] As explained with respect to requests 36 to 49 seeking discovery about the CI, the accuracy of this information provided by the CI and the CI's motives potentially influencing that accuracy is relevant and helpful to establish predisposition as well as essential for a fair determination of predisposition.

[32] The five requirements or conditions are:

(1) the government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the

V.   Outrageous Government Conduct

       Defendants next maintain that various discovery requests are
relevant to an outrageous government conduct defense or a motion
based on the defense.   (Docket Entry # 182).   The government
asserts defendants fail to identify facts suggesting a viable
claim for discovery, and the defense "has never succeeded in the
First Circuit."   (Docket Entry # 190, pp. 25-26).

       The doctrine of outrageous government conduct "permits
dismissal of criminal charges only in those *very rare* instances
when the government's misconduct is so appalling and egregious as
to violate due process by 'shocking . . . the universal sense of
justice.'"   Luisi, 482 F.3d at 59 (quoting United States v.
Russell, 411 U.S. 423, 432 (1973)) (emphasis added); accord
United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019).
Indeed, Anzalone rejected the defense in the context of a
government sting operation.   Anzalone, 923 F.3d at 5-6.   In
addition, the First Circuit in Luisi recognized that the holding
in a Third Circuit case cited by defendants (Docket Entry # 182,

_____

        middleman to employ a specified inducement, which could be
        found improper, against the targeted defendant; (4) the
        agent's actions led the middleman to do what the government
        sought, even if the government did not use improper means to
        influence the middleman; and (5) as a result of the
        middleman's inducement, the targeted defendant in fact
        engaged in the illegal conduct.

Rivera-Ruperto, 846 F.3d at 429 (quoting Luisi, 482 F.3d at 55)
(quotation marks omitted).

p. 11) (citing United States v. Twigg, 588 F.2d 373 (3d Cir.
1978) (finding outrageous government misconduct)), was
"subsequently questioned" in a later Third Circuit decision.
Luisi, 482 F.3d at 59 n.19 (citing United States v. Porter, 764
F.2d 1, 9 n.4 (1st Cir. 1985), citing United States v. Beverly,
723 F.2d 11, 12 (3d Cir. 1983)).  Separately, defendants'
reliance on United States v. Santana, 808 F. Supp. 77, 84 (D.
Mass. 1992) (Docket Entry # 182, p. 12), is questionable in light
of the First Circuit's reversal.  United States v. Santana, 6
F.3d 1 (1st Cir. 1993).

Without a case in the First Circuit upholding a successful
dismissal of criminal charges based on outrageous government
misconduct and the facts in this case exhibiting a sting
operation that lacked outrageous government misconduct, discovery
to support this tenuous defense is likely unsuccessful as lacking
materiality under Brady and Rule 16(a)(1)(E)(i).  That said, this
court declines to reject the defense outright as a basis for
discovery.  Rather, this court will proceed to evaluate the
defense for the specific requests in which defendants raise it.

VI.  Selective Enforcement and Prosecution

Defendants seek discovery in a number of requests because it
is relevant, critical, and/or necessary to their defenses of
selective enforcement and prosecution.  (Docket Entry # 182, pp.
17, 23-24, 27, 30-31, 33, 38).  They note an intention to bring a

36

"Motion to Dismiss based on selective enforcement and prosecution."  (Docket Entry # 182, p. 31, n.15).  They also submit: statistics in other cases regarding prosecution of African American and/or Hispanic individuals in stash-house sting operations (Docket Entry # 182, p. 39, n.20); a 2014 newspaper article on the topic of targeting "racial and ethnic minorities" in drug sting operations; a 2016 law review article stating that "'approximately 90% of the individuals currently imprisoned as a result of [a] . . . stash house sting are either African-American or Hispanic'" (Docket Entry # 182, pp. 38-39); and a 2021 magazine article (Docket Entry # 198, p. 2, n.3).  Like the government (Docket Entry # 190, pp. 26-29), defendants cite Armstrong v. United States, 517 U.S. 456 (1996) (Docket Entry # 182, p. 12).  Armstrong imposed a threshold parameter for criminal discovery based on a selective prosecution claim.  See id. at 458.

Selective prosecution is similar yet distinct from selective enforcement.[33]  "Selective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race."  Conley v. United States, 5 F.4th 781, 789 (7th Cir. 2021).  "Selective enforcement

---

[33]  Although the two claims are distinct, the "'selective prosecution'" and "'selective enforcement'" labels of the claims are "sometimes deployed interchangeably to denote selective prosecution."  United States v. Washington, 869 F.3d 193, 214 (3d Cir. 2017).

occurs when police investigate people of one race but not similarly-situated people of a different race" and it generally "precedes the prosecutor's role." Id.; see United States v. Jackson, No. 16-CR-2362-WJ, 2018 WL 6602226, at *1 (D.N.M. Dec. 17, 2018) ("selective enforcement claim is an Equal Protection challenge alleging that law enforcement officials selectively investigated or arrested defendants because of their race").

To establish a claim for selective prosecution as well as for selective enforcement in violation of equal protection under the Fifth Amendment, the defendant must show that the prosecution or the investigative policy "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Armstrong, 517 U.S. at 465 (selective prosecution claim); see United States v. Griffith, 928 F.3d 855, 866 (10th Cir. 2019) (quoting Armstrong, 517 U.S. at 465, and stating "selective-enforcement claim requires essentially the same showing"); United States v. Sellers, 906 F.3d 848, 850 (9th Cir. 2018) (selective-enforcement claim requires defendant to show "enforcement had a discriminatory effect and was motivated by a discriminatory purpose"); United States v. Washington, 869 F.3d 193, 214 (3d Cir. 2017) ("*[s]ubstantive* claims of selective prosecution and selective enforcement . . . evaluated under the same two-part test[:] . . . discriminatory effect and  . . discriminatory intent," i.e., "'discriminatory purpose'") (emphasis in original);

38

United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001)

("selective enforcement defense requires that a defendant show a

discriminatory intent by law enforcement and a discriminatory

effect, in that similarly-situated individuals were not

investigated or arrested based on race"); see generally

Armstrong, 517 U.S. at 464 (noting that selective prosecution

claim is based on "equal protection component of the Due Process

Clause of the Fifth Amendment").  In describing the "demanding"

standard to prove a selective prosecution claim, the Armstrong

Court reasoned that "United States Attorneys" occupy "a 'special

province' of the Executive" branch and receive a "'presumption of

regularity'" in their prosecutorial decisions made in the

exercise of their discretion of whether to prosecute and what

charges to lodge.  Armstrong, 517 U.S. at 464-65.  The Court also

expressed "a concern not to unnecessarily impair the performance

of a core executive constitutional function" because it leads to

"delays," chills law enforcement, and "may undermine

prosecutorial effectiveness by revealing the Government's

enforcement policy."[34]  Id. at 465.  Notably, the Court tied the

---

[34]  More fully stated, the Court delineated the following
costs in a proceeding with a selective prosecution claim:

    Examining the basis of a prosecution delays the criminal
proceeding, threatens to chill law enforcement by subjecting
the prosecutor's motives and decisionmaking to outside
inquiry, and may undermine prosecutorial effectiveness by
revealing the Government's enforcement policy.

"demanding" standard to establish a selective prosecution claim
to the showing necessary to obtain discovery, which it
characterized as "a significant barrier" and "rigorous." Id. at
463-64 (cases delineating demanding standard to prove selective-
prosecution claim afford "'background presumption'" that showing
"to obtain discovery should itself be a significant barrier to
the litigation of insubstantial claims"); id. at 468
("justifications for a rigorous standard for the elements of a
selective-prosecution claim thus require a correspondingly
rigorous standard for discovery in aid of such a claim").

Criminal discovery to support a selective prosecution claim
requires defendant to make a threshold "credible showing of
different treatment of similarly situated persons." Armstrong,
517 U.S. at 470; see id. at 469 ("we consider what evidence
constitutes 'some evidence tending to show the existence' of the
discriminatory effect element"). "The Court in *Armstrong*" thus
"insisted that the defendant produce evidence that persons of a
different race, but otherwise comparable in criminal behavior,
were presented to the United States Attorney for prosecution, but
that prosecution was declined." United States v. Davis, 793 F.3d
712, 720 (7th Cir. 2015). Defendants fail to make this showing
to justify discovery of the information they seek to support

---

Armstrong, 517 U.S. at 465 (quoting Wayte v. United States, 470
U.S. 598, 607 (1985)) (quotation marks omitted).

their selective prosecution defense.  In making this assessment, this court considered defendants' belatedly-filed supplemental memorandum.  (Docket Entry # 198).[35]

In addition to tying the discovery standard to the "demanding" substantive standard to prove selective prosecution, the Court cited specific reasons for the correspondingly-rigorous discovery standard:

> If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy.

Armstrong, 517 U.S. at 463-64, 468.

The issue of what, if any, threshold showing to impose on a defendant seeking criminal discovery to support a selective enforcement claim is one a first impression in the First Circuit. A district court in Maine rejected a request for records of a Trooper's prior traffic stops to develop the defendant's argument

---

[35]    The two unpublished decisions defendants cite (Docket Entry # 198) impose wide-ranging discovery orders which span a seven-year time period and require production of, inter alia, "[a]ll documents containing instructions" by supervisors in the United States Attorney's Office in the Northern District of Illinois "about the responsibilities of AUSA's [sic] to ensure that defendants . . . have not been targeted due to their race, color, ancestry or national origin." United States v. Williams, No. 12-cr-887 (N.D. Ill. July 31, 2013) (Docket Entry # 70); United States v. Brown, No. 12-cr-632 (N.D. Ill. July 31, 2013) (Docket Entry # 153).  Neither decision cites any legal authority and the scope of the productions is precisely the kind of wide-ranging discovery Armstrong discourages.

of racial profiling and selective enforcement in a traffic stop case because the defendant failed to provide any support that the Trooper's "investigation was not supported by a reasonable suspicion of criminal activity." United States v. Jones, 2:19-cr-00201-JDL, 2020 WL 3128905, at *4 (D.Me. June 12, 2020).

The Ninth, Third, and Seventh Circuits depart from Armstrong in the context of government sting investigations in selective enforcement claims. See Sellers, 906 F.3d at 855; Washington, 869 F.3d at 221; Davis, 793 F.3d at 721-23. When faced with a selective enforcement claim in a reverse sting operation, the Ninth Circuit did not require the defendant to show evidence of different treatment of similarly-situated individuals to obtain discovery. See Sellers, 906 F.3d at 855. The court in Sellers did, however, require the defendant to show "*something* more than mere speculation" and left open "what that *something* look[ed] like" for district court to determine in the exercise of its discretion. Id. (emphasis in original). Sellers involved a stash-house sting operation and part of the reasoning to depart from Armstrong in a selective-enforcement claim was the difficulty of proving "who the ATF could have investigated but did not" in sting operations. Id. As stated in Sellers, "'In the stash house sting context, a defendant would face considerable difficulty obtaining credible evidence of similarly situated individuals who were not investigated by ATF.'" Id. at

42

853-54 (quoting United States v. Hare, 820 F.3d 93, 101 (4th Cir. 2016), in parenthetical).  Sellers, Washington, and Davis also distinguished the reasoning in Armstrong of affording prosecutors in the executive branch "'special province" and a "'presumption of regularity'" to their decisions, Armstrong, 517 U.S. at 464, because law enforcement agents performing investigative duties are not shielded by the "strong privileges" applicable to a prosecutor's deliberations and acts.  Sellers, 906 F.3d at 853; see Washington, 869 F.3d at 219-220; Davis, 793 F.3d at 720.

     The Sellers court "join[ed] the Third and Seventh Circuits," which previously concluded "that Armstrong's rigorous discovery standard [did] not apply in the context of selective enforcement claims involving stash house reverse-sting operations." Sellers, 906 F.3d at 854 (citing Third Circuit's decision in Washington, 869 F.3d at 219–21, and Seventh Circuit's decision in Davis, 793 F.3d at 719-21).  As indicated, Sellers, Washington, and Davis all involve sting operations.[36]  Although the Davis court found "[t]he racial disproportion in stash-house prosecutions . . . troubling" and "a legitimate reason for

---

[36]     The government's position that the First Circuit decision in Flowers v. Fiore, 359 F.3d 24, 34-35 (1st Cir. 2004), aligns with the Armstrong standard (Docket Entry # 190, p. 26) is true to the extent it pertains to the elements of a selective-enforcement claim.  Flowers, however, was a civil proceeding and did not address the discovery standard.

discovery," the court "proceed[ed] in measured steps."[37]  *Davis*, 793 F.3d at 722.  The Third Circuit in Washington agreed with the "general approach of taking 'measured steps' over the course of discovery."  Washington, 869 F.3d at 220.  Specifically, where a defendant makes a proffer "strong enough to support a reasonable inference of discriminatory intent and non-enforcement," the district court may conduct a limited inquiry "of the sort recommended by *Davis*, and cabined to the same considerations of judicial economy and the need to avoid protracted pretrial litigation of matters collateral to the upcoming trial."  Id. at 221.

With respect to request 50, defendants fail to make the showing described in Davis, 793 F.3d at 723, or in Washington,

---

[37]  The "measured steps" suggested in Davis entail the following.  First, based on the evidence defendant provides, the district court "decide[s] whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred."  Davis, 793 F.3d at 723.  "If not," the district court should "turn to the substance of the charges." Id.  Conversely, if this initial inquiry gives the court reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity" to commit the crime, it may "be appropriate to require" the "ATF to disclose, in confidence, their . . . targeting criteria . . in camera" in order to protect "the legitimate interest of law enforcement in preventing suspects (and potential suspects) from learning how to avoid being investigated or prosecuted."  Id. Discussing Davis, the government summarizes this procedure. (Docket Entry # 190, p. 28, n.3).

869 F.3d at 221.[38]  This court has no reason to believe that non-

black suspects would not have been offered the opportunity for a

stash-house robbery in the event such suspects were, as Cousin

was, already actively requesting individuals to locate drug

dealers with stash houses and report back to him with the

information.  (Docket Entry # 182-2, ¶ 12) (Docket Entry # 182-4,

¶ 6).  Defendants do not assert they have additional evidence to

support racial targeting of black individuals in this district in

or around 2019.  Cf. Davis, 793 F.3d at 723.  Agent Jacobsen

corrected the mistaken reference to convictions as opposed to

juvenile adjudications.[39]  The CI's purported "personal motive"

or conflict with Cousin (Docket Entry # 182, pp. 2, 31) premised

on the CI's statement to Cousin (Docket Entry # 182-3, ¶ 18) ("'I

know we're not on good terms'") does not evince targeting based

---

[38]  In seeking discovery of the information set out in
request 50, defendants contend the information is also relevant
to the entrapment and outrageous government conduct defenses as
well as the selective enforcement defense.  The cases defendants
cite (Docket Entry # 182, p. 31) uniformly address selective
enforcement or selective prosecution.  They do not address an
entrapment and/or outrageous government conduct defense.  Hence,
defendants fail to explain or articulate why the information in
request 50 is relevant to their entrapment or outrageous
government conduct defense.  Having not adequately developed an
argument that the information is relevant to support the
entrapment or outrageous government conduct defense under Rule
16(a)(1)(E) or Brady, defendants waive production of the
information in request 50 as relevant to an entrapment or
outrageous government conduct defense under Rule 16(a)(1)(E) and
Brady.  See Oladosu, 744 F.3d at 39.

[39]  See footnote five.

on Cousin being black.  Defendants' assertion that "law
enforcement had a motive to target Cousin in retaliation for
exercising his rights in the murder case" (Docket Entry # 182, p.
31) is not based on fact but, rather, speculation.  Moreover, the
alleged "retaliation for exercising his rights" is not indicative
of racial animus or a racial motive.  Accordingly, defendants do
not make the threshold showing under <u>Davis</u>, and they also fail to
make the threshold showing under <u>Washington</u>.  Nor do they satisfy
the more stringent threshold showing under <u>Armstrong</u>.  Request
50 is therefore denied.

VII. <u>Vindictive Prosecution</u>

    Defendants contend that information sought in certain
discovery requests is relevant, critical, or required to support
their vindictive prosecution defense.  (Docket Entry # 182, pp.
9, 17, 23-24, 27, 30, 33, 37-38).  A vindictive prosecution in
violation of the "Fifth Amendment right to due process" occurs
when "the prosecutor seeks to punish the defendant for exercising
a protected statutory or constitutional right."  <u>United States v.
Jenkins</u>, 537 F.3d 1, 3 (1st Cir. 2008) (citing <u>United States v.
Goodwin</u>, 457 U.S. 368, 372 (1982)).  In order to establish a
vindictive prosecution defense, the defendant may either: (1)
produce "evidence of actual vindictiveness"; or (2) demonstrate
"circumstances that reveal a sufficient likelihood of
vindictiveness to warrant a presumption of vindictiveness."  <u>Id.</u>

(citation omitted).  "A presumption of vindictiveness does not
ordinarily arise in the pretrial setting."  United States v.
Heinel, Criminal Action No. 19-10081-IT, 2021 WL 4776661, at *2
(D. Mass. Oct. 13, 2021) ("'a change in the charging decision
made after an initial trial is completed is much more likely to
be improperly motivated than is a pretrial decision'") (quoting
United States v. Goodwin, 457 U.S. 368, 381 (1982).  Here, Agent
Jacobsen filed a criminal complaint on January 28, 2020, which
this court issued the same day upon a finding of probable cause.
On March 5, 2020, the grand jury issued an Indictment, and there
is no Superceding Indictment.

More to the point, entitlement to discovery requires
defendants "first to come forth with 'some' objective evidence
tending to show the existence of prosecutorial vindictiveness."
United States v. Bucci, 582 F.3d 108, 113 (1st Cir. 2009)
(citations omitted).  To obtain such discovery, defendants "must
do more than simply 'identify a potential motive for
prosecutorial animus.'"  Id. at 114 (citation omitted).  Rather,
defendants "must connect any vindictive animus to those making
the challenged charging decisions in his case."  Id. (citation
omitted).  Furthermore, "'evidence of suspicious timing alone
does not indicate prosecutorial animus.'"  Id. (citation
omitted).  For example, the First Superceding Indictment in Bucci
issued six months after the defendant engaged in protected speech

47

by starting a website was "not so close in time" and did not

"provide strong evidence that the prosecutor acted vindictively."

Id.  The time span between Cousin's purported exercise of his

statutory or constitutional right regarding the murder case and

the prosecutorial decisions in this case is not as suspicious as

defendants suggest (Docket Entry # 182, pp. 24, 37).

VIII.   Specific Requests

     Having articulated the basis to seek discovery under Brady

and Rule 16(a)(1)(E), as well as the defenses defendants assert

to obtain discovery regarding certain requests, this court turns

to the 35 requests at issue.  Consistent with defendants' and the

government's references, this court uses the original numbers in

defendants' May 2021 discovery letter (Docket Entry # 168) to

identify the requests and groups the requests into the categories

used by defendants and the government.

A.   Discovery of General Investigative Information (¶¶ 1-15)

**1.  ATF reports containing unredacted report sequence numbers ("Report Number" box in upper right corner of page) and any missing reports from the sequence.**

     Defendants request unredacted report numbers and additional

ATF reports, if any, that are missing from the sequenced reports.

(Docket Entry # 182, pp. 13-14).  They submit it is essential for

them to review the ATF reports "to understand the full scope" of

the investigation and its execution.  (Docket Entry # 182, pp.

13-14).  The government represents it provided defendants with

48

ATF reports with redacted page numbers and cites "Fed. R. Crim.
P. 16(a)(1)(C)"[40] as precluding production of unredacted or
missing ATF reports.  (Docket Entry # 182-1, p. 2) (Docket Entry
# 190, p. 30).

Rule 16(a)(2) provides that "reports, memoranda, or other
internal government documents made by . . . a government agent in
connection with investigating or prosecuting the case" are "not
subject to disclosure" under "this rule," i.e., inclusive of Rule
16(a)(1)(E).  Fed. R. Crim. P. 16(a)(2); see Fed. R. Civ. P.
16(a) advisory committee's note to 2013 amendment.  As correctly
indicated by the government (Docket Entry # 190, pp. 30-31), the
voluntary production by the government of a number of ATF reports
does not override this statute.

As to production under Brady, it is unclear if the
government reviewed undisclosed ATF reports, if any, for
favorable and material information under Brady.  Accordingly, the
government shall: (1) review any withheld ATF reports concerning
the investigation of defendants relative to this prosecution to
determine if the reports contain favorable and material
information under Brady in the next two weeks; and (2) produce

---

[40]  By its terms, Rule 16(a)(1)(C) governs discovery requests
"if the defendant is an organization."  Fed. R. Crim. P.
16(a)(1)(C).  Because the government cites Rule 16(a)(1)(C) as
precluding defendants' access to "reports" (Docket Entry # 190,
p. 30), this court assumes the government intended to cite Rule
16(a)(2).

any such favorable and material information to defendants within one week of its determination that the information is, in fact, favorable and material under Brady.  See  Prochilo, 629 F.3d at 268 (government "primarily responsible for deciding" evidence it must disclose under Brady) (citation omitted).

**2.   The ATF "Case Initiation" report (CP01000) with unredacted BPD report and investigation reference numbers.**

Listing the discrepancies and mistakes in the case initiation report, defendants seek production of seven unredacted BPD reports attached to the case initiation report.  The attached BPD reports correspond to Cousin's seven juvenile and criminal matters described in the case initiation report.[41]  (Docket Entry # 182, p. 14) (Docket Entry # 182-2, ¶¶ 5-11).  The case initiation report redacts the BPD reports' investigation numbers (Docket Entry # 182-2, p. 4), which defendants also request. Defendants maintain the information regarding Cousin's criminal history is relevant to his propensity to commit the charged offenses and "is *the* critical issue for the defenses of entrapment and outrageous government misconduct."  (Docket Entry # 182, p. 17).  It is also relevant to the selective enforcement, selective prosecution, and vindictive enforcement defenses, according to defendants.  They further submit the information

---

[41] Defendants do not dispute the government's representation that the government provided defendants with redacted copies of the BPD reports.  (Docket Entry # 190, p. 36).

50

regarding the false statements is "relevant as *Brady/Giglio*
material about the agents, for *Franks* motions challenging the
warrant affidavits, and for a motion asserting that the approval
and use of a stash house sting in this case were products of and
amounted to outrageous government misconduct."  (Docket Entry #
182, p. 17).

Turning to the entrapment defense, defendants maintain that:
(1) the October 20, 2019 home invasion is the closest relevant
crime to show predisposition; and (2) the information in the case
initiation report regarding the home invasion is false.[42]
(Docket Entry # 182, p. 14).  The government, however, provided
defendants with redacted copies of the BPD report concerning the
October 20, 2019 home invasion which the ATF had at the time of
the investigation.  (Docket Entry # 182-1, ¶ 20-21) (Docket Entry
# 168, ¶ 20).  Defendants also have the description of the home
invasion in the case initiation report.  Hence, they have
information to support the assertion that Cousin was not involved
in the home invasion such that additional information in
unredacted form is both overlapping and somewhat duplicative.
Although disclosure may lead to additional information further
weakening Cousin's connection to the home invasion, a criminal
record of committing prior offenses related to the charged

---

[42]   See footnote eight.

51

offense is not enough to allow a jury to find predisposition.[43]
See Acosta, 67 F.3d at 339.  The relatively strong evidence of
Cousin's predisposition, shown by Cousin actively requesting
people to locate drug dealers with stash houses and to report the
information back to him prior to any government-initiated contact
(Docket Entry # 182-2, ¶ 12) (Docket Entry # 2-1, ¶ 7) (Docket
Entry # 182-4, ¶ 9), reduces the materiality of the withheld
information regarding the home invasion under Rule 16(a)(1)(E)(i)
as well as under Brady.  Prior to any government-initiated
contact, Cousin also requested the CI "to make such a phone call
by attempting to contact a third party seeking information
related to a potential stash house."  (Docket Entry # 182-4, ¶
9).  Accordingly, the requested disclosure of the information
regarding the October 2019 home invasion is not required.
Similar reasoning precludes disclosure regarding the other BPD
reports in unredacted form and their investigation numbers.

Defendants' contention that Agent Jacobsen's description of
the murder in the case initiation report provides a basis for
disclosing the redacted BPD report's investigation number and the
unredacted BPD report is mistaken.  Defendants assert that Agent
Jacobsen insinuates that Cousin committed the murder.[44]  Whereas

---

[43]  Defendants also note this principle.  (Docket Entry #
182, pp. 10-11).

[44]  See footnote six.

defendants note Agent Jacobsen's statement that "according to BPD reports, 'numerous witnesses, forensic, and video evidence, lead to the identification of Cousin as the person who assaulted the victim,'" they omit the immediately following language "before an associate shot and killed the victim." (Docket Entry # 182, p. 15) (Docket Entry # 182-2, ¶ 6). Furthermore, defendants' complaint that Agent Jacobsen misstates the outcome by stating "COUSIN was found Not Guilty in a jury trial" (Docket Entry # 182, p. 16) (Docket Entry # 182-2, ¶ 6) overemphasizes the import of this minor mischaracterization. The statement does not support defendants' assertion that Agent Jacobsen deliberately or misleadingly "'trump[ed] up' Cousin's dangerousness." (Docket Entry # 182, p. 14). In fact, Agent Jacobsen reduced any misconception by more precisely describing the murder charge in the January 31, 2020 affidavit. Therein, he attests that Cousin was "charged with murder and found not guilty based on a judicial finding of insufficient evidence in May of 2019." (Docket Entry # 182-4, ¶ 6). Defendants' contention that Agent Jacobsen "misrepresents the homicide charge" against Cousin or insinuates that "Cousin committed the [homicide] crime" (Docket Entry # 182, p. 15) is therefore not convincing as a basis to unredact the BPD report or compel production of the BPD investigation number.

The remaining aspects of the description of Cousin's prior record in the case initiation report are not significant and less

relevant than the home invasion incident.  The distinction between a sawed-off shotgun and a sawed-off rifle[45] is immaterial.  Each is a dangerous weapon.  As to convictions as opposed to juvenile adjudications, defendants have sufficient information to challenge the initial mistake in the case initiation report and the first affidavit.  Agent Jacobsen corrected the mistaken reference to the juvenile adjudications as convictions in the second affidavit.  (Docket Entry # 182-4, ¶ 8).  The government also provided (or will provide) defendants with a copy of the complaint regarding the May 2009 assault and battery with a dangerous weapon described in the case initiation report.[46]  Although defendants profess they have "no idea" where the fictitious assertion regarding Cousin being "on foot" and stabbing the victim "come[s] from" (Docket Entry # 182, p. 16), the case initiation report sufficiently attributes the statement to "BPD police reports" (Docket Entry # 182-2, ¶ 8).  The government represents it provided defendants the BPD report in redacted form.  (Docket Entry # 190, p. 35).

Examining the requested disclosures in the context of the other defenses defendants assert to compel the disclosures, the outrageous government conduct defense is very rarely successful. See <u>Luisi</u>, 482 F.3d at 59.  The First Circuit rejected the

---

[45]  See footnote 11.

[46]   See footnote ten.

defense in a government sting operation.  See Anzalone, 923 F.3d
at 5-6.  As such, disclosure of unredacted BPD reports and
investigation numbers relative to Cousin's criminal history is
even less material under Brady and Rule 16(a)(1)(E)(i) regarding
this defense than the entrapment defense.  The government's
correction of the four convictions to juvenile adjudications
further evidences that all of the misrepresentations or mistakes
in the case initiation report are far afield from appalling and
egregious conduct which shocks "'the universal sense of
justice.'"  Luisi, 482 F.3d at 59 (citation omitted).  The weak
and limited showing regarding Agent Jacobsen's mistakes in the
case initiation report as constituting egregious conduct in the
context of an extremely difficult defense to establish
(outrageous government conduct) demonstrates that disclosure of
the unredacted BPD report and investigation number at this time
would not enable Cousin to significantly "'alter the quantum of
proof in his favor.'"  Goris, 876 F.3d at 45 (citations omitted).
Disclosure would also not put the entire "'case in such a
different light as to undermine confidence'" in a verdict against
defendants.  DeCologero, 802 F.3d at 161 (citation omitted).

     Defendants also fail to satisfy the rigorous standard for
discovery relative to a selective prosecution defense.  In
addition, they fail to provide objective evidence of
prosecutorial vindictiveness to warrant discovery regarding the

vindictive prosecution defense.  See Bucci, 582 F.3d at 113-114.
The CI did not make the charging decisions and his purported
motive to implicate Cousin (Docket Entry # 182, p. 7) does not
equate to Agent Jacobsen's motive to file the criminal complaint
or the Assistant United State Attorney's (or his superior's)
motive to seek an indictment based on the fictitious sting
operation.  See id. at 114 (defendant "must connect any
vindictive animus to those making the challenged charging
decisions in his case").  The record at present does not include
"'some' objective evidence tending" to show prosecutorial
vindictiveness.  Id. at 113.  Agent Jacobsen's mistakes in the
case initiation report do not evidence vindictiveness in light of
his subsequent corrections in the second affidavit.  Separately,
defendants do not explain the relevance of the undisclosed BPD
reports and investigation numbers to the selective enforcement
defense, which entails discriminatory intent and discriminatory
impact.[47]  Overall, the requested discovery regarding these two
defenses is therefore not material under Rule 16(a)(1)(E) or
exculpatory and material under Brady.

The remaining basis for disclosure is the relevance of the
information to support a Franks motion.  (Docket Entry # 182, p.
17).  The government argues there is "no showing of materiality"

---

[47]  Cousin and Perry are each Black.  (Docket Entry # 17-1,
p. 1) (Docket Entry # 17-2, p. 1).

56

and it is the veracity of the affiant (Agent Jacobsen) rather than the CI or the BPD "that is at issue."  (Docket Entry # 190, pp. 37-38).

Agent Jacobsen's mistakes in the first affidavit (which the case initiation report also include), and, to a lesser degree, the second affidavit[48] are decidedly not necessary to establish probable cause because, without the purportedly false or reckless statements in the affidavits, there is ample probable cause, as argued by the government (Docket Entry # 190, p. 38).  See generally United States v. Moon, Criminal No. 11-10223-DJC, 2012 WL 2178923, at *1-2 (D. Mass. June 13, 2012); accord Franks, 438 U.S. at 156 (if hearing establishes "perjury or reckless disregard . . ., and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded").  Similarly, Agent Jacobsen's omissions (such as the omissions from the first affidavit that four of the convictions were juvenile adjudications) would not, if included in the consideration of probable cause, result in the affidavit failing to demonstrate probable cause.  Defendants have redacted BPD reports with information from which to evaluate the oversights in the affidavits or the omissions not included in the affidavits.  Given the benign nature of the oversights and the

---

[48]   See footnote five.

omissions, it is unlikely that information in the unredacted
portion of the BPD reports or unredacted BDP investigation
numbers would support or lead to information supporting a
successful <u>Franks</u> motion.  <u>See id.</u> at *12 (rejecting discovery
because "it is not clear that such information would cast doubt
on the admissibility of evidence in this case or would, as Moon
suggests, give support to his *Franks* motion").  There is little,
if any, indication that unredacted BPD reports and BPD
investigation numbers would reveal a knowing or intentional false
statement or omission and that such statements or omissions were
*necessary* for the probable cause finding relative to the first or
second affidavit.  Hence, the requested information would not
"cast doubt on the admissibility of evidence the government
anticipates using in its case-in-chief," i.e., the fruits of the
search.  <u>See Monell</u>, 2013 WL 12437912, at *4 (citation and
quotation marks omitted); <u>Jordan</u>, 2010 WL 625280, at *3; L.R.
116.2(b)(1)(2) (requiring production of "information that would
cast doubt on" admissibility of government's anticipated evidence
in case-in-chief "and that could be subject to" suppression
motion within 28 days of arraignment).  Request number two is
denied.

**5.  An unredacted copy of the "SRT8 After Action Report" located
at CP001124-1129, including but not limited to the names of the
"SRT personnel at operation location," the "name(s) of SRT
personnel who deployed diversionary devices," and the "name(s) of
SRT personnel who utilized less lethal munitions."**

58

Defendants next seek an unredacted copy of the SRT report and the names of SRT members at the scene of the arrest and, in particular, the SRT member(s) who deployed the diversionary device and non-lethal projectiles that struck defendants during the arrest.  (Docket Entry # 182, pp. 17-19).  They submit the information will allow them "to investigate the training, experience, and history of the agents who used these serious and dangerous weapons in a scenario that was controlled and manufactured by the government."  (Docket Entry # 182, p. 18).  Defendants maintain that a lack of training or history of misusing weapons is relevant to the outrageous government conduct defense "and to future motions to suppress the cell phone evidence seized without a warrant."  (Docket Entry # 182, p. 19).  The government submits that names of the SRT personnel present at the time of the arrest are not "relevant or discoverable at this juncture."  (Docket Entry # 182-1, ¶ 5).

The government also represents that the redacted material "at the end of the report does not pertain to actions that day or to the conduct of any personnel present."  (Docket Entry # 182-1, ¶ 5).  Given this representation, production of an unredacted copy of this portion of the SRT report is not required under Brady or Rule 16(a)(1)(E).  Because defendants have information regarding the conduct of the SRT members, the manner of the cell phone access, and the events at CubeSmart (Docket Entry # 182,

59

pp. 4-5, 17-18) (reciting the events), information in the other redacted portions of the SRT report is cumulative and not material under either <u>Brady</u> or Rule 16(a)(1)(E)(i).  Production of an unredacted SRT report is denied.

Regarding discovery of the names of the SRT members under Rule 16(a)(1)(E), to the extent one or more SRT members are witnesses the government plans to call in its case-in-chief, defendants "'have no right in noncapital cases to disclosure of the names of government witnesses under Rule 16(a).'"  <u>United States v. Caldwell</u>, No. 4:19CR961 SRC/NCC, 2021 WL 1269518, at *2 (E.D. Mo. Mar. 18, 2021) (citation omitted), *report and recommendation adopted*, 2021 WL 1265198, at *1 (E.D. Mo. Apr. 6, 2021); <u>accord</u> <u>United States v. Reis</u>, 788 F.2d 54, 58 (1st Cir. 1986) (no requirement under Rule 16 mandating disclosure of "identity of the government's trial witnesses"); <u>United States v. Friel</u>, Criminal No. 06-25-P-H, 2006 WL 2061395, at *1 (D. Me. July 21, 2006) (criminal defendants do not have "pretrial right to discover the government's witness list in a non-capital case").  That said, L.R. 116.2, adopted in 1998, sets certain deadlines pertaining to witnesses the government anticipates calling in its case-in-chief.  <u>See</u> <u>United States v. Herr</u>, Criminal No. 16-10038-IT, 2016 WL 4099068, at *3 (D. Mass. Aug. 2, 2016).  Absent invocation of the declination procedure under L.R. 116.6, this court assumes the government complied with L.R.

116.2(B)(1)(C) to (E).  Accordingly, with respect to the names of
SRT members who the government anticipates calling as witnesses,
the request for such information under Rule 16(a)(1)(E) is
denied.  To the extent the government does not intend to call one
or more members of the SRT as a government witness, the names are
not subject to disclosure under Rule 16(a)(1)(E).  <u>See</u> <u>generally</u>
<u>United States v. Michael</u>, No. 13 CR 902-1, 2014 WL 5901661, at *4
(N.D. Ill. Nov. 13, 2014) (denying "pretrial list containing the
names and addresses of witnesses the Government does not intend
to call at trial").

Turning to discovery under <u>Brady</u>, defendants assert the
names are relevant to the outrageous government conduct defense.
(Docket Entry # 182, p. 19).  The defense, however, is rarely
successful.  <u>See</u> <u>Luisi</u>, 482 F.3d at 59.  In the case at bar, the
SRT members did not know the location of the other "crew member,
who was the 'driver,'" and it is likely they knew he had the
firearms because Cousin told the UC "the driver was in possession
of the firearms."  (Docket Entry # 182-4, ¶ 36).  Perry noted
"that the driver was 'right around the corner.'"  (Docket Entry #
182-4, ¶ 36).  The distinct possibility of a crew member in the
vicinity with firearms increased the need to use the force the
SRT member(s) deployed which, in turn, reduced the purportedly
appalling and egregious nature of the conduct.  Defendants'
assertion "that agents *knew* Cousin and Perry were unarmed"

because "they had just disrobed in the locker" (Docket Entry #
182, p. 18) is not entirely accurate.  As aptly pointed out by
the government (Docket Entry # 190, p. 39), defendants did not
turn out their pockets or show they did not have any weapon in
their socks.  More broadly, the circumstances fall substantially
short of showing appalling and egregious conduct shocking to
"'the universal sense of justice.'"  <u>Id.</u>

In addition, Cousin actively participated in the operative
events regarding fictitious robbery.  Moreover, Cousin, as
opposed the government, directly brought Perry into the
operation.  In this circuit, "a defendant may be barred from
claiming outrageousness if he has been too active himself."
<u>United States v. Bradley</u>, 820 F.2d 3, 7 (1st Cir. 1987) (citing
<u>United States v. Arteaga</u>, 807 F.2d 424, 427 (5th Cir. 1986)).  As
further elucidated in <u>Arteaga</u>, the outrageous government conduct
defense requires "a passive role by the defendant" thus
preventing "a defendant who actively participates in the crime"
from "avail[ing] himself of the defense."  <u>Arteaga</u>, 807 F.2d at
427; <u>see</u> <u>also</u> <u>Luisi</u>, 482 F.3d at 59 ("*Bradley* acknowledged that
an outrageousness claim might be defeated if a defendant has been
'too active himself.'").

Considering the undisclosed names of the SRT members and the
evidence at the scene, including the conduct of the SRT members,
as well as the difficulty of showing outrageous government

conduct, withholding the names of SRT members would not undermine confidence in the verdict.  Accordingly, given defendants' meager showing in the context of a tenuous defense, the withheld information vis-à-vis the outrageous government conduct defense is not material under <u>Brady</u>.

   With regard to defendants' assertion that the name(s) of SRT personnel "is relevant . . . to future motions to suppress the cell phone evidence seized without a warrant," the *name* of the SRT member who deployed the non-lethal projectile against either Perry or Cousin is not material and therefore not subject to production at this time under <u>Brady</u>.  There is little indication that defendants do not know the manner in which the SRT member(s) accessed the cell phones because they describe the events in their motion.  (Docket Entry # 182, pp. 5, 18).  They also "have the full forensic extractions of both phones," as stated by the government.  (Docket Entry # 190, p. 41).  Accordingly, they have the information necessary to prepare a motion to suppress the cell phone evidence, including information relative to the manner and circumstances of the seizure as well as the existence, if any, of exigent circumstances.  <u>See generally</u> <u>Riley v. California</u>, 573 U.S. 373, 388 (2014) (noting availability of exigent circumstances to address danger to arresting officers or public even though warrantless cell phone search not allowed as incident to arrest) (citing <u>Warden, Md.</u>

Penitentiary v. Hayden, 387 U.S. 294, 298-299 (1967)).  The
events at CubeSmart are not indicative of a lack of training on
the part of SRT members and defendants fail to show otherwise.
The additional value provided by knowing the name of the SRT
member(s) who shot defendants with non-lethal projectiles or the
names of the other SRT members, whether to understand their
training or their experience, is marginal and insufficient to
place the "record in 'such a different light as to undermine
confidence in the verdict.'"  Paladin, 748 F.3d at 444 (citation
omitted).

    Out of an abundance of caution, however, this court directs
the government to: (1) review the identities of the SRT members
at the CubeSmart location (including those who accessed the cell
phones and deployed the diversionary devices); (2) review the
experience and training of these SRT members and whether such
experience and training would cast doubt on the admissibility of
cell phone evidence the government anticipates using in its case-
in-chief, see Moon, 2012 WL 2178923, at *2 (exculpatory evidence
under Brady "includes evidence that casts doubt on" credibility
or accuracy of anticipated government witness "or [on] evidence
the government expects to proffer at trial") (citations omitted);
and (3) if it does cast such doubt or otherwise constitute Brady
material, disclose the names of such SRT member(s).  See
generally Prochilo, 629 F.3d at 268 (noting "government is

64

primarily responsible for deciding what evidence" is subject to disclosure under Brady).  The government shall conduct the review in the next two weeks and produce the information within one week of its determination that the names of the SRT members are subject to production.  Request number five is otherwise denied.

**6.  Any policies, procedures, memoranda, or guidance by any federal agency, including the Department of Justice and ATF, concerning use of force by law enforcement during investigations and arrests, including use of firearms (including SAGE Arms SL-6), kinetic energy projectiles (including K03 OC rounds), rubber bullets, plastic bullets, and other forms of weaponry. Any policies, procedures, memoranda, or guidance concerning documentation that must be completed in connection with law enforcement's use of force is also requested.**

Defendants seek production of the above information to evaluate the violation of "any policy or procedure concerning use of 'less-lethal' weapons," presumably on the part of SRT personnel, "or whether any such guidance exists at all."  (Docket Entry # 182, p. 19).  They submit the information is relevant to the outrageous government conduct defense and discoverable under Rule 16(a)(1)(E).

Defendants bear the burden of showing materiality under Rule 16(a)(1)(E) by providing "'some indication'" that disclosure of the information at this time prior to trial would enable them to significantly "'alter the quantum of proof in [their] favor,'" Goris, 876 F.3d at 44, on the outrageous government conduct defense.  As previously explained, the evidence to support this defense is weak, and the defense itself very rarely succeeds.

See Luisi, 482 F.3d at 59.  Defendants are likely "barred from claiming outrageousness" because their participation in the crime was "too active."  Bradley, 820 F.2d at 7 (citing Arteaga, 807 F.2d at 427); see also Luisi, 482 F.3d at 59.  The strength of the evidence regarding a due process violation premised on appalling and egregious government misconduct is decidedly minimal.  See Luisi, 482 F.3d at 59 (quoting Russell, 411 U.S. at 432).  Under both Brady and Rule 16(a)(1)(E)(i), materiality is absent.

**8.  Unredacted copies of CP0482-85 (ATF report regarding Cousin's cell phone extraction); 9. Copies of all "attachments" referenced in CP0482-83 (same ATF report); and 10. Copies of all "attachments" referenced in CP0484-85 (ATF report regarding Perry cell phone extraction).**[49]

The government represents that "defendants already have this information in unredacted form because they have the full forensic extractions of both phones."  (Docket Entry # 190, p. 41).  The government further states that the referenced ATF reports "in the requests have simply put subsets of this information in report form."  (Docket Entry # 190, p. 41).  The requests are therefore moot.  With respect to the requests for

---

[49]  Request numbers nine and ten respectively specify the following: (1) attachments regarding subcategories of text messages, phone search history, and photos of firearms and cocaine in the ATF report as well as redacted names with the first and last initial showing in attachments for "RMV Record" and "BPD"; and (2) attachments regarding subcategories of extraction reports and redacted names with the first and last initial showing in attachments for "RMV Record," "BPD," and "RMV Records."  (Docket Entry # 168, ¶¶ 9-10).

"unredacted names of the individuals" beyond the disclosed first
and last name initials (Docket Entry # 168, ¶¶ 9-10), the
requests are denied as lacking materiality under <u>Brady</u> and Rule
16(a)(1)(E)(i).

**11.  A copy of the recorded conversation between SA Jacobsen and Christopher Santos on February 13, 2020, regarding the charged conspiracy.**

On February 13, 2020, the government arrested Christopher
Santos ("Santos") on a criminal complaint for being a felon in
possession of a firearm.  <u>See</u> <u>United States v. Santos</u>,
20-mj-06082-MPK.  Agent Jacobsen submitted an affidavit to
support the complaint and a one-count Indictment issued on March
12, 2020.  <u>See</u> <u>United States v. Santos</u>, Crim. No. 20-10084-RGS.

After the arrest, Agent Jacobsen interviewed Santos in a
recorded conversation.  The government contends that Santos is
the driver and third crew member.  (Docket Entry # 190, p. 42)
(Docket Entry # 182-4, ¶¶ 36, 42).

In request 11, defendants seek a copy of the February 13,
2020 recorded conversation between Agent Jacobsen and Santos
regarding the charged conspiracy.  (Docket Entry # 182, pp. 21-
23).  Defendants reason that Santos's recorded statements are
discoverable because the government does not intend to call him
as a witness thereby precluding a Jencks Act bar to pretrial
production.  Extending this reasoning, defendants submit that
Santos's statements are attributable to Cousin or Perry under

67

Fed. R. Evid. 801(d)(2)(E) ("Rule 801(d)(2)(E)") as those of a coconspirator[50] and, therefore, discoverable as Perry's or Cousin's oral statement under Rule 16(a)(1)(A). (Docket Entry # 182, pp. 22-23). The government argues that "Rule 16 does not provide for discovery of statements of other individuals." (Docket Entry # 182-1, ¶ 11).

In short, defendants seek statements of a purported coconspirator (Santos) which may be admissible against them under Rule 801(d)(2)(E) and submit they are discoverable before trial as their own statements under Rule 16(a)(1)(A). (Docket Entry # 182, p. 22). "[T]he First Circuit has not yet addressed the issue, although it has acknowledged that other circuit courts of appeal 'have held that co-conspirators' statements are *not* discoverable under [Rule 16(a)(1)]." United States v. June, Criminal No. 10-30021-MAP, 2011 WL 4443429, at *3 (D. Mass. Sept. 22, 2011) (citing Corcoran v. United States, No. 92-1016, 1992 WL 311895 (1st Cir. Oct. 29, 1992) (unpublished)) (emphasis added); see Corcoran, 1992 WL 311895, at *4 (noting "other circuits have

---

[50] Rule 801(d)(2)(E) allows the admission into evidence of out-of-court statements by a defendant's "coconspirator during and in furtherance of the conspiracy" offered "against an opposing party." Fed. R. Evid. 801(d)(2)(E). In the First Circuit, a party seeking to introduce the statement must show "that: (1) when the statement was made, the declarant was a member of a conspiracy, (2) the defendant was also (or later became) a member of the same conspiracy, and (3) the statement was made in furtherance of that conspiracy." United States v. Weadick, 15 F.4th 1, 8 (1st Cir. 2021).

held that coconspirators' statements are not discoverable under Fed. R. Crim. P. 16(a)(1)(A)" and finding no need to resolve the issue).  Notably, the plain language of Rule 16(a)(1)(A) requires the government to "disclose to the defendant the substance of" statements "made *by the defendant*."  Fed. R. Crim. P. 16(a)(1)(A) (emphasis added).

Notwithstanding the district court cases outside this circuit cited by defendants, a more recent district court case in *this* district denied a similar request based on the above language.  See United States v. Place, Criminal No. 09-10152-NMG, 2010 WL 2105879, at *1 (D. Mass. May 24, 2010) (denying defendant's request for coconspirator's statements for non-testifying coconspirator because Rule 16(a)(1) "requires disclosure of statements 'by the defendant,'" language which "does not encompass statements made by coconspirators" under Rule 801(d)(2)(E)).  An even more recent district court case in the District of Puerto Rico reaches the same result.  United States v. Rodríguez-Canchani, Criminal No. 19-710 (FAB), 2021 WL 4768272, at *4 (D.P.R. Oct. 12, 2021) (denying "request for statements by indicted and unindicted conspirators" as beyond "scope of the United States' discovery obligations" and quoting Place, 2010 WL 2105879 at *1).  Adhering to this precedent and the reasoning, the request is denied.

B.  Discovery regarding Cousin's criminal history, the launch of the sting operation, and Brady/Giglio material (¶¶ 16-32, 50)

**16.  All documents concerning or comprising the "information" referenced in CP001000 that Mr. Cousin "was actively and frequently participating in home invasions and robberies," the identities of the BPD or other enforcement personnel who provided this "information," and the date(s) on which the "information" was provided; and**

**17.  All documents concerning or comprising any other communications between ATF and BPD concerning Mr. Cousin, including without limitation notes, emails, and text messages.**

The case initiation report begins by stating that Cousin "was actively and frequently participating in home invasions and robberies" in Boston.  (Docket Entry # 182-1, p. 2).  In request 16, defendants seek documents concerning this information, the identities of BPD personnel who provided the information, and the dates such personnel provided the information.  Defendants submit the requested information is "*Brady/Giglio* material."  (Docket Entry # 182, p. 23).  In request 17, defendants seek documents concerning other communications between the ATF and the BPD regarding Cousin and assert that "[t]he BPD was involved in the misrepresentations made about Cousin."  (Docket Entry # 182, p. 23).  According to defendants, the BPD purportedly "*knew* that Cousin was not the chip-toothed suspect in [the] home invasion," and the ATF included the murder allegation against Cousin in the case initiation report even though the Associate Justice's dismissal made clear "there was no evidence that Cousin committed the crime."  (Docket Entry # 182, pp. 23-24).  With respect to both requests, defendants summarily state the information "is

70

critical to the anticipated defenses of entrapment, outrageous government misconduct, selective enforcement and prosecution, and vindictive enforcement and prosecution." (Docket Entry # 182, p. 23). The government points out it voluntarily provided reports and documents responsive to the request and defendants otherwise fail to provide an adequate basis for providing them "the identities of BPD personnel who shared information and the dates on which they did so." (Docket Entry # 190, p. 43) (Docket Entry # 182-1, ¶ 16-17).

The government represents that it does not anticipate calling as witnesses in its case-in-chief the members of the BPD who might have provided information to Agent Jacobsen. (Docket Entry # 190, p. 45).[51] Disclosure of the identities of these BPD members is not required under Brady or Rule 16(a)(1)(E). See United States v. Soto-Beníquez, 356 F.3d 1, 39 (1st Cir. 2003) (rejecting Brady claim and noting "analysis might have been different if the government had ultimately called Rodríguez–López as a witness at trial" because "his earlier lies to the government would certainly have constituted a basis for

---

[51] In making this representation, the government refers to "Request 19," which this court assumes is an oversight and that the government intended to refer to request 16. The government made the representation in the course of discussing requests 16 to 18 (Docket Entry # 190, p. 45), and it is request 16, as opposed to request 17, which seeks "the identities of the BPD" officers providing the information. (Docket Entry # 168, ¶ 16). Request 19 seeks the address where the home invasion took place. (Docket Entry # 168, ¶ 19).

impeaching him"); <u>United States v. Michael</u>, No. 13 CR 902-1, 2014
WL 5901661, at *4 (N.D. Ill. Nov. 13, 2014) (denying "pretrial
list containing the names and addresses of witnesses the
Government does not intend to call at trial").

Disclosure of information referenced in the case initiation
report that Cousin "was actively and frequently participating in
home invasions and robberies" (Docket Entry # 181-2, p. 2) is not
required at this time under <u>Brady/Giglio</u> as well as under each of
the foregoing defenses for reasons similar to the reasons for
nondisclosure of unredacted BPD reports and investigation
reference numbers addressed in request number two.  Defendants
have the information of Cousin's prior criminal history in the
case initiation report and the government identified and
corrected various mistakes.  Defendants also have information
relative to Cousin's alleged involvement in the October 20, 2019
home invasion.  (Docket Entry # 184-4, ¶ 10 & n.2) (Docket Entry
# 182-1, ¶ 5).  The government represents that it provided
defendants with redacted copies of the BPD reports referenced as
attachments to the case initiation report (Docket Entry # 182-2,
p. 4), including a redacted BPD report regarding the home
invasion which the ATF had at the time of the investigation.
(Docket Entry # 190, p. 36) (Docket Entry # 182-1, ¶ 20-21).  A
defendant's prior criminal record is not "enough by itself" to
find predisposition relative to an entrapment defense.  <u>Acosta</u>,

67 F.3d at 339.  As discussed below, defendants' counsel will be receiving impeachment information relative to the CI's statements to Agent Jacobsen that Cousin was actively requesting people to "locate drug dealers with stash-houses" and requested the CI "to make such a phone call" (Docket Entry # 182-2, ¶ 12).  These and other reasons elaborated in denying request number two regarding the entrapment defense as well as the outrageous government conduct, selective enforcement and prosecution, and vindictive prosecution defenses preclude disclosure under Rule 16(a)(1)(E) and at this time under <u>Brady/Giglio</u>.

Defendants' contention that the murder allegations against Cousin render the ATF and the BPD communications relevant and necessary to support the selective enforcement, the selective prosecution, and the vindictive prosecution defenses (Docket Entry # 182, p. 24) is speculative and, alternatively, not convincing largely for the reasons that the information requested in request two is not subject to disclosure.

**18.  Documents concerning findings or complaints against law enforcement personnel referenced in the previous two requests, including without limitation their inclusion on any "Brady list" maintained by prosecutors.**

Defendants focus this request on seeking complaints against the "[o]ne or more people at the BPD" involved in "providing information to the ATF regarding Cousin's status as a suspect in multiple unsolved crimes in Boston."  (Docket Entry # 182, p.

73

25).  Defendants contend they are "entitled to know whether" these officers have prior "histories of misconduct" and need their names to determine if they are on a list compiled in September 2020 by the Office of the Suffolk County District Attorney of BPD officers flagged by prosecutors as having engaged in misconduct.  (Docket Entry # 182, p. 25) (citing https://www.wbur.org/news/2020/09/25/rollins-suffolk-da-police-credibility-brady).  Defendants maintain the government refuses to identify the BPD officers who provided the information. (Docket Entry # 182, p. 25) (Docket Entry # 182-1, ¶ 18).

       In light of the government's representation that it does not anticipate calling as witnesses BPD members "who might have provided information to" Agent Jacobsen (Docket Entry # 190, p. 45), the request for the names of the BPD detectives or officers to ascertain their histories of misconduct is denied.  See Soto-Beníquez, 356 F.3d at 39; Michael, 2014 WL 5901661, at *4. With respect to the request for documents concerning findings or complaints, including the BPD officer's inclusion on a Brady list, any such documents are not subject to production under Brady.  See United States v. Rodriguez, No. 10-4129, 2012 WL 2948191, at *2 (3d Cir. July 20, 2012) (affirming denial of in camera review of alleged Brady material consisting of internal affairs file against Officer Norman who would not be testifying

74

at trial) (unpublished);[52] <u>United States v. Newby</u>, No. 08-5271, 2010 WL 4948970, at *1 (4th Cir. Dec. 3, 2010) (denying <u>Brady</u> request for documents pertaining to police department internal affairs investigation of police officer who testified at trial) (unpublished).

The requested documents are also not material under Rule 16(a)(1)(E)(i). First, defendants fail in their burden to establish "'some indication'" that pretrial disclosure "'would have enabled the defendant significantly to alter the quantum of proof in his favor.'" <u>Goris</u>, 876 F.3d at 44. Rather, they speculate that the referenced BPD officers have prior histories of misconduct or are included in "a *Brady* list." (Docket Entry # 182, p. 25). Second and in the alternative, to the extent the requested documents constitute "internal government documents" within the meaning of Rule 16(a)(2), they are not subject to production under Rule 16(a)(E). <u>See</u> Fed. R. Crim. P. 16(a)(2). Request 18 is denied.

**19. Documents concerning the October 20, 2019 home invasion in Boston: the address where the invasion occurred (Request 19); all BPD investigation reports concerning the robbery (Request 20); and identification of the BPD detective who allegedly corroborated the "chipped tooth" description of Cousin (Request 27).**

---

[52] <u>See</u> <u>United States v. Rodriguez</u>, No. 07-cr-00709 (E.D. Pa. Oct. 29, 2008) (attachment D to Docket Entry # 100 reflects that Officer Norman's internal affairs file includes departmental violations and open investigation alleging criminal conduct).

Defendants argue that the foregoing home invasion "information goes directly to the credibility of the agents, the outrageousness of the government's conduct, *Franks* motions, and entrapment."  (Docket Entry # 182, p. 27).  They also identify the relevance of the information "to selective and vindictive enforcement and prosecution."  (Docket Entry # 182, p. 27).

With respect to request number two, this court articulated the reasons why an unredacted copy of the BPD report and the investigative number regarding the October 2019 home invasion are not material under either Rule 16(a)(1)(E)(i) or <u>Brady</u>. Defendants' arguments are similar to those presented to support disclosure of the information requested in request number two. (Docket Entry # 182, pp. 14-15, 17, 25-27).  The same reasons that preclude pretrial disclosure of the home invasion information in request number two as lacking materiality likewise preclude pretrial disclosure of the home invasion information sought in request numbers 19, 20, and 27 as lacking materiality.

By way of example, even if the statement by the BPD detective that one of the fleeing suspects matched the description of Cousin as having a chipped tooth was mistaken because the description provided pertained to the individual taken into custody (Green), the requested information regarding the home invasion is not material.[53]  The relatively strong

---

[53]  See also footnote number eight.

evidence of predisposition exemplified by Cousin actively requesting people to locate drug dealers with stash houses and report back to him prior to any government-initiated contact (Docket Entry # 182-2, ¶ 12) (Docket Entry # 2-1, ¶ 7) (Docket Entry # 182-4, ¶ 9) renders the undisclosed requested information far less probative of predisposition for the entrapment defense. The fact that Cousin also requested the CI "make such a phone call by attempting to contact a third party seeking information related to a potential stash house" in October 2019 reinforces the strength of Cousin's predisposition or propensity.

Separately, for reasons stated regarding request 16, disclosure of the identity of the BPD detective is not required. See Soto-Beníquez, 356 F.3d at 39; Michael, 2014 WL 5901661, at *4.

## 21.  All BPD reports regarding two T-Mobile store robberies in 2019 the government asserts Cousin was connected to.

In the December 27, 2019 affidavit to support the search warrant application, Agent Jacobsen included a paragraph describing two robberies of iPhone cell phones from a T-Mobile store, one occurring on August 20, 2019, and the other occurring on October 27, 2019.  (Docket Entry # 182-3, ¶ 13).  As stated in the affidavit, "BPD police reports" reflect that the suspects in the first robbery fled the scene in a vehicle registered to an individual (Damon Stallings), and the CI stated that Stallings "takes orders from COUSIN."  (Docket Entry # 182-3, ¶ 13).

77

Defendants submit that the government included the allegation(s) in this paragraph because "the government thought this showed criminal propensity on Cousin's part."  (Docket Entry # 182, p. 27).  According to defendants, the allegation(s) therefore "must be treated as propensity evidence – no matter how far-fetched – and the defense is [thus] entitled to" pretrial disclosure of the BPD reports.  (Docket Entry # 182, p. 27). Defendants thus implicitly depict the allegations as inculpatory propensity evidence, even if far-fetched.[54]  (Docket Entry # 182, p. 27).  The government omitted the allegations from the January 31, 2020 affidavit.

As explained in connection with request number two, Cousin was actively requesting people to locate drug dealers with stash houses and report back to him.  This conduct took place before any contact with the government through the CI in late November 2019.  See Saemisch, 18 F.4th at 61 (predisposition "inquiry focuses on the defendant's predisposition before" government contact).  In October 2019, Cousin "requested" the CI "to make such a phone call."  (Docket Entry # 182-2, ¶ 12) (Docket Entry #

---

[54]  "*Brady* imposes no obligation on the government to disclose inculpatory evidence prior to trial."  United States v. Fletcher, Crim. No. 15-10393-RGS, 2018 WL 5778251, at *2 (D. Mass. Nov. 2, 2018) (citing Prochilo, 629 F.3d at 268-269); see United States v. Marte, Case No. 16-cr-30044-MGM, 2018 WL 4571657, at *5 (D. Mass. Sept. 24, 2018) (in contrast to Brady's "obligation to disclose exculpatory evidence . . . Rule 16 requires the disclosure of inculpatory and exculpatory evidence").

182-4, ¶ 9).  The strength of this propensity evidence and the
marginal or far-fetched propensity evidence arising from the
cited allegations in the December 27, 2019 affidavit (Docket
Entry # 182, p. 27) (citing paragraph 13 in December affidavit)
render pretrial disclosure of the BPD reports of the two
robberies highly unlikely to alter the quantum of proof.
Defendants do not satisfy their burden to show materiality under
Rule 16(a)(1)(E)(i).  The request is denied.

**22.  All reports concerning a September 2019 robbery of Bryan
Joyce that the CI allegedly told the government Cousin was
involved in.**

Request 22 asks for a video of an alleged September 2019
robbery of Brian Joyce ("Joyce") by Cousin, "all reports
concerning [the] robbery, and the exact date on which it
occurred."  (Docket Entry # 168, ¶ 22).  The government
represents and defendants do not dispute that the government
provided the video and a redacted ATF report in which the CI
informed Agent Jacobsen that "Cousin committed an unreported
robbery of Bryan Joyce."  (Docket Entry # 182-1, ¶ 22) (Docket
Entry # 190, p. 48).  Defendants contend that the reports
concerning the robbery and the exact date "are *Brady/Giglio*
material relevant to both the CI's credibility and Jacobsen's."
(Docket Entry # 182, p. 28).  As support, defendants assert "[o]n
information and belief" that the video shows Joyce "laughing with
cash," which therefore makes the CI's statement to Agent Jacobsen

79

that Cousin committed the robbery appear "baseless."  (Docket Entry # 182, pp. 27-28).

The government disagrees with defendants' description of the video and represents that it "does not show Joyce laughing but instead shows him being contrite and subdued as he accedes to Cousin's demand that he apologize for something not apparent from the video itself."  (Docket Entry # 190, p. 49).  Accepting the government's representation as accurate as opposed to defendants' depiction based on information and belief, defendants' argument that the requested information for reports of the robbery and its exact date will impeach the CI's statement or lead to information that will impeach the CI's or Agent Jacobsen's credibility is unconvincing.  Disclosure at this time is not required under "*Brady/Giglio*" or Rule 16(a)(1)(E)(i).  The request is denied.

**23. Unredacted reports concerning a "shots fired" incident on November 15, 2019 in which the government suggests Mr. Cousin was involved.**

This request is moot because the government states it "will provide this report in unredacted form."  (Docket Entry # 190, p. 49).

**24.  Any information or documents indicating that Mr. Cousin was not involved in uncharged/unsolved crimes referenced in ATF reports and search warrant applications.**

Defendants request "exculpatory information concerning each incident the ATF accuses Cousin of having participated in." (Docket Entry # 182, p. 28).  In full, the request reads as

80

follows: "Any information or documents indicating that Mr. Cousin was not involved in uncharged/unsolved crimes referenced in ATF reports and search warrant applications, including without limitation robberies on October 27, October 20, September, and August 20, 2019, and a shooting in November 2019."  (Docket Entry # 168, ¶ 24).

The request for information and documents regarding the October 20, 2019 home invasion is similar to, albeit more encompassing than, the request for the unredacted BPD report and investigation number regarding the October 20, 2019 home invasion in requests two and 20.  It is denied for similar reasons.

The request for information and documents concerning the November 2019 shooting is denied.  The government states it "will provide" the BPD report of this incident "in unredacted form." (Docket Entry # 190, p. 49).  In light of this anticipated production, defendants do not satisfy their burden to show materiality under Rule 16(a)(1)(E)(i) given the absence of some indication that production of *additional* information would enable defendants to alter the quantum of proof in their favor.  As to production under <u>Brady</u>, the information and documents are of marginal benefit and likely include cumulative information.  As such, disclosure is insufficient to undermine confidence in the outcome of a trial.

With respect to any *other* "uncharged/unsolved crimes

referenced in ATF reports and search warrant applications"
(Docket Entry # 168, ¶ 24) including with respect to the
September 2019 and August 20, 2019 robberies, the government
shall: (1) review the ATF reports and search warrant applications
in this case and determine if favorable and material information
or documents in its possession, custody, or control exist under
Brady in the next two weeks; and (2) produce such information, if
any, to defendants within one week of its determination.  Request
24 is otherwise denied.  As to production under Rule 16(a)(1)(E)
for this same material, defendants do not satisfy their burden to
show materiality for any non-Brady material the government does
not produce under the foregoing procedure, and reports or other
internal government documents, namely the ATF reports, are not
subject to production.  See Fed. R. Crim. P. 16(a)(2).

**25.  All BPD FIOs of Cousin from 2019 to the present.**

Defendants' basis for disclosure of the "BPD FIOs" is that
"[t]he government relied on these [FIOs] in obtaining a search
warrant for Cousin's phone location information."[55]  (Docket
Entry # 182, p. 29).  In the December 27, 2019 affidavit used to
support the search warrant application for the cell phone used by
Cousin, Agent Jacobsen recites that police interviewed Cousin "on

---

[55]  Defendants also submit the government has possession of
the "BPD FIOs."  (Docket Entry # 182, p. 29).  The government
represents they are "not in the government's possession" (Docket
Entry # 168, ¶ 25), and this court finds no reason to doubt this
representation.

numerous occasions due to his gang affiliation." (Docket Entry # 182-3, ¶ 11). In the next sentence, Agent Jacobsen states that, "[a]ccording to documentation of those FIOs, COUSIN closely associates himself with other violent gang members . . ." (Docket Entry # 182-3, ¶ 11).

The documentation in the "BPD FIOs" about Cousin's close association with violent gang members is not material under Rule 16(a)(1)(E)(i). Cousin's membership in the Columbia Road street gang is firmly established by other evidence. Cousin has a "'CR' tattoo" which other members of the gang also bear. (Docket Entry # 182-2, ¶ 4). The BPD uses a point system to verify gang members, and Cousin has the largest number of points "in the Columbia Road gang." (Docket Entry # 182-2, ¶ 4) (Docket Entry # 182-3, ¶ 8) (Docket Entry # 182-4, ¶ 7). Pretrial disclosure of the information in "BPD FIOs" at this point in time would not enable defendants to significantly alter the quantum of proof in their favor. See Goris, 876 F.3d at 45.

The information is also not material under Brady. Rather, it is cumulative of the tattoo evidence and Cousin's point count evidencing his membership in the Columbia Road gang. See United States v. Raymundí-Hernández, 984 F.3d 127, 162 (1st Cir. 2020) (citations omitted). Pretrial production would not undermine confidence in the trial. Request 25 is denied.

**26. All documents concerning the stop, at gunpoint, of Mr. Cousin by law enforcement on or around June-July 2019 in Boston**

**near Woodrow Avenue and Norfolk.**

Defendants seek documents concerning a stop by "law enforcement" (Docket Entry # 168, ¶ 26) of Cousin at gunpoint in June or July 2019 in Boston near Woodrow Avenue.  (Docket Entry # 182, p. 29).  They do not, however, sufficiently show there was such a stop.  In their motion, they do not point to any evidence in the record showing the stop took place.  The request for information regarding the purported stop is therefore speculative, and they fail to discharge their burden to show materiality under Rule 16(a)(1)(E)(i).  See Goris, 876 F.3d at 44-45.

The speculative nature of the request also forecloses production under Brady.  "Mere conjecture that certain communications 'might contain exculpatory evidence' without 'any supporting evidence or arguments to indicate this was, in fact, the case,' is inadequate to ground a claimed Brady violation." United States v. Simon, 12 F.4th 1, 52 n.13 (1st Cir. 2021). Request 26 is denied.

**28.  Inspection of the beanie with the camera worn by the UC on January 28, 2020.**

Defendants seek to inspect the beanie as a tangible object worn by the UC on January 28, 2020 because an inspection "is 'material to the defense'" under Rule 16(a)(1)(E)(i).  (Docket Entry # 182, p. 29).  They argue that an inspection is relevant to show there was no meeting of the minds between defendants and

the UC to proceed with the robbery.  (Docket Entry # 182, pp. 29-30).  In addition, "inspection of the beanie is relevant to a defense of withdrawal from the conspiracy," according to defendants.  (Docket Entry # 182, p. 30).  As to their defense of withdrawal or as a basis to refute an intent to commit the robbery, defendants reason that a continued "belief by Cousin and/or Perry that the UC was still wearing a camera" after "the UC stripped in the locker" would "mean that Cousin and Perry had no intention of committing the (fictitious) robbery with the UC." (Docket Entry # 182, pp. 29-30).  They contend that "[t]he more conspicuous the camera in the beanie [was], the less likely that a conspiracy existed at the time of the arrest."  (Docket Entry # 182, p. 30).  The government submits that the beanie and the information about whether it concealed a recording device and the location of any such device is subject to an investigative privilege.  (Docket Entry # 190, pp. 50-51).

Count One of the Indictment charges a Hobbs Act conspiracy to commit robbery.  "To convict a defendant of a Hobbs Act conspiracy, the government must prove that the defendant possessed 'an intent to agree and an intent to commit the substantive offense.'"  United States v. Valentini, 944 F.3d 343, 348-49 (1st Cir. 2019) (quoting United States v. Morales-Machuca, 546 F.3d 13, 20 (1st Cir. 2008)).  "'[T]he government need only demonstrate a tacit understanding between the conspirators.'"

Morales-Machuca, 546 F.3d at 20 (citation omitted).  Perry's
declaration that "'We'll get the job done'" as well as Cousin's
statement that he felt "'so much better'" evidence their intent
to agree and their intent to rob the purported stash house.  See
Valentini, 944 F.3d at 349 (noting that "Valentini used the words
"we" and "us" when referring to the crew" as evidencing his
participation in the conspiracy to commit extortion).

The investigative privilege protects "'documents that would
tend to reveal law enforcement investigative techniques or
sources.'"  Association For Reduction of Violence v. Hall, 734
F.2d 63, 65-66 (1st Cir. 1984) (citation omitted).  The First
Circuit endorses a qualified privilege "in the context of
criminal trials where a defendant seeks disclosure of
confidential government surveillance information."  United States
v. Cintolo, 818 F.2d 980, 1002 (1st Cir. 1987) (affirming lower
court's denial of defense questioning "concerning the precise
location of the electronic surveillance devices" in apartment).
In recognizing the privilege, the court in Cintolo reasoned that
discovery "of this kind of information will enable criminals to
frustrate future government surveillance and perhaps unduly
jeopardize the security of ongoing investigations."  Id.; see
also Unger v. Cohen, 125 F.R.D. 67, 70 (S.D.N.Y. 1989) (privilege
guards confidentiality of police investigative techniques and
protects against weakening law enforcement programs by disclosure

of techniques to public).

As indicated, the privilege is not absolute and "can be overcome by a sufficient showing of 'need.'"  Cintolo, 818 F.2d at 1002 (citation omitted).  The necessity determination uses "'a case by case balancing'" approach controlled by principles of fairness.  Id. (quoting United States v. Harley, 682 F.2d 1018, 1020 (D.C. Cir. 1982).[56]  "'[A] defendant seeking to learn the *location* of a police surveillance post should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point.'" Cintolo, 818 F.2d at 1002 (quoting Harley, 682 F.2d at 1020) (emphasis added);[57] see also United States v. Alimehmeti, 284 F.

---

[56]  The court in Harley more fully elaborates the analysis to include weighing the showing of need against the policies underlying the privilege:

> A defendant seeking to learn the location of a police surveillance post should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point. The degree of the handicap he establishes must then be weighed by the trial judge against the policies underlying the privilege. This is necessarily a somewhat ad hoc balancing process so that, as *Roviaro* said, "no fixed rule with respect to disclosure is justifiable." Id. at 62, 77 S.Ct. at 628.

Harley, 682 F.2d at 1020.

[57]  The First Circuit subsequently extended the privilege "recognized for 'confidential government surveillance information,' Cintolo, 818 F.2d at 1002, to 'law enforcement techniques and procedures.'"  Commonwealth of P.R. v. United States, 490 F.3d 50, 64 (1st Cir. 2007) (citation omitted).

Supp. 3d 477, 494 (S.D.N.Y. 2018).  In fact, "[a] key to
evaluating" necessity in Cintolo was "the extent to which
adequate alternative means could have substituted for the
proffered testimony."  Id. at 1003.[58]  Here, defendants's showing
of need did not raise or address the absence of an alternative
means in lieu of inspection of the beanie to show it was "less
likely that a conspiracy existed at the time of [defendants']
arrest."  (Docket Entry # 182, p. 30).  In fact, they did not
address the alternative means at the hearing or in their reply
brief filed weeks after the hearing.[59]  For example, a photograph

_____

[58]  The First Circuit in Cintolo noted the following
regarding the existence of alternative methods to show that not
everyone in the apartment heard the statements by others in the
room or was involved the same conversation:

  the jury heard evidence regarding the size of the Prince
  Street apartment—evidence from which it could have concluded
  that not all persons present in the apartment necessarily
  heard every conversation . . . the government's electronics
  expert conceded this possibility during cross-examination .
  . . No claim was made that the premises were unavailable for
  inspection, or that information as to the floor plan was
  kept from defense witnesses.

Cintolo, 818 F.2d at 1003; see also United States v. Angiulo, 847
F.2d 956, 983 (1st Cir. 1988).

[59]  Specifically, defendants do not address the existence of
an alternative means to show withdrawal or the absence of a
meeting of the minds.  See Cintolo, 818 F.2d at 1002.
Defendants' reply brief does not address the alternative means
and defense counsel did not address the issue at the hearing on
the motion when the government again asserted the privilege.  At
most, during the hearing defense counsel referred to the
government's investigative privilege but did not address the
alternative means.  Rather, defense counsel asserted the
relevance or need for an inspection to show that a meeting of the

of the beanie in the condition it was in when the UC showed it to defendants in the storage unit or immediately thereafter at the time of the arrest may (or may not) provide an alternative means. Without developing any argument, however, defendants waived the issue that an alternative means does not exist.[60]  See Oladosu, 744 F.3d at 39.

More broadly, defendants' statements in the storage unit upon seeing the UC turn the beanie inside out on January 28, 2020 convincingly support their intent to agree and to commit the robbery.  In light of defendants' conduct and statements, a withdrawal from the conspiracy is difficult to show or support. See United States v. Simon, 12 F.4th 1, 67 (1st Cir. 2021) ("'[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal' from" conspiracy) (citation omitted).  For example, a defendant who initially participates in a conspiracy does not withdraw by simply ignoring coconspirators'

---

minds was less likely.

[60]  The discussion that follows is not intended to avoid this waiver, which this court reserves as a basis to deny the request for an inspection.  See Negron-Almeda v. Santiago, 528 F.3d 15, 26 (1st Cir. 2008) (stating "rule" that if party belatedly raises argument "in the district court but that court, *without reservation*, elects to decide it on the merits, the argument is deemed preserved for later appellate review") (emphasis added); accord United States v. Veloz, 948 F.3d 418, 431 (1st Cir. 2020) (citing Trenkler v. United States, 536 F.3d 85, 96 (1st Cir. 2008)).  Separately, defendants did not request an evidentiary hearing to resolve the privilege and therefore also waived any such hearing.  See Oladosu, 744 F.3d at 39.

"phone calls and not otherwise manifesting any involvement in
[the conspiracy] thereafter." United States v. Lara, 970 F.3d
68, 79 (1st Cir. 2020); see id. ("withdrawal typically 'requires
"either a full confession to authorities or a communication by
the accused to his co-conspirators that he has abandoned the
enterprise and its goals"'") (quoting United States v. Piper, 298
F.3d 47, 53 (1st Cir. 2002)) (ellipses omitted).  Defendants'
statements after seeing the UC turn the beanie inside out
strongly evidence they did not see and no longer suspected a
camera or other recording device even if it was conspicuous.[61]
Their conduct thereafter of passively walking towards the second
vehicle does not materially detract from the import of these
statements.

        Moreover, even assuming defendants showed a moderate level
of need, it is outweighed by the polices underlying the
privilege.  Disclosing the location of the camera or other
recording device (or its absence) will educate criminals about
how to protect themselves from surveillance and likely compromise
the use of such cameras or other recording devices as a law
enforcement tool.  See Cintolo, 818 F.2d at 1002 (setting out
policies and quoting United States v. Van Horn, 789 F.2d 1492,
1507-08 (11th Cir. 1986)).  At present, therefore, the qualified

_____

        [61]  Defendants logically note that, "clearly, Cousin and
Perry would not conspire with a known agent wearing a camera."
(Docket Entry # 182, p. 29).

privilege afforded to "confidential government surveillance information," <u>Cintolo</u>, remains intact and precludes inspection of the beanie.  Request 28 is denied.

**31.  All documents concerning authorization to conduct a fictitious stash house robbery "sting" operation in this case.**

Citing <u>United States v. McLean</u>, 199 F. Supp. 3d 926, 943 (E.D. Pa. 2016), defendants argue that "the defenses of entrapment, outrageous government misconduct, and selective and vindictive prosecution/enforcement all turn on the ATF's basis for launching" the fictitious sting operation against Cousin. (Docket Entry # 182, p. 30).  The government correctly points out that <u>McLean</u>, a fictitious sting operation case, is not about discovery.  (Docket Entry # 190, p. 51).  Rather, the court in <u>McLean</u> explains the basis for imposing a sentence below the Sentencing Guidelines to avoid "offend[ing] due process" given "the inherently arbitrary way in which stash house sting cases first ensnare suspects" and the "concentration of power that allows the Government to define both crime and punishment."  <u>Id.</u> at 943.

With respect to the requested discovery, defendants have the case initiation report and redacted BPD reports.  The former includes the authorization by the Group Supervisor and the review and approval by the SAC.  (Docket Entry # 182-2, p. 2). The case initiation report and Agent Jacobsen's January 31, 2020 affidavit describe the commencement of the investigation in October 2019

91

when the CI provided Agent Jacobsen with information that Cousin, a Columbia Road street gang member, "was actively requesting that people locate drug dealers with stash-houses" and report back to him with the information.  (Docket Entry # 182-4, ¶ 6) (Docket Entry # 182-2, ¶ 12).

Rule 16(a) does not authorize discovery under Rule 16(a)(1)(E) of "internal government documents" made by government agents investigating this case.  Fed. R. Civ. P. 16(a)(2).  In light of the information defendants already possess, production of additional documents concerning authorization is insufficient to undermine confidence in the outcome of a trial.  Hence, production under <u>Brady</u> is not required.  Accordingly, the request is denied.

**32.  With regard to Special Agent Jacobsen, all material owed under <u>Giglio v. United States</u>, 405 U.S. 150 (1972).**

In requesting all material under <u>Giglio</u>, defendants argue that production is required at this time under <u>Brady</u> for two reasons.  (Docket Entry # 182, pp. 31-33).  First, they submit that Agent Jacobsen "wielded incredible power" by inventing the fictitious crime and "creating ten-year mandatory minimum sentences" for defendants given the quantities of cocaine. (Docket Entry # 182, pp. 32-33).  Second, they contend "there is considerable evidence that Jacobsen inappropriately manufactured facts to justify the intended operation."  (Docket Entry # 182, p. 33).

This court assumes that Agent Jacobsen will testify at trial in light of the significant role he played in the investigation and, as such, he is a key government witness.  This court also assumes that the government complied with its automatic disclosure obligations in the event it anticipates calling Agent Jacobsen as a witness.[62]  <u>See</u> L.R. 116.2(b)(1)(C) to (E).

Exculpatory evidence under <u>Brady</u> "includes evidence that casts doubt on the credibility or accuracy of any witness the government anticipates calling at trial or any evidence the government expects to proffer at trial."  <u>Moon</u>, 2012 WL 2178923, at *2 (citing <u>Bagley</u>, 473 U.S. at 678, and <u>Giglio</u>, 405 U.S. at 154); <u>see</u> <u>Bagley</u>, 473 U.S. at 676 ("prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest" and "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule").  The Supreme Court in <u>Giglio</u> "recognized that the prosecution's <u>Brady</u> obligation includes the disclosure of information potentially useful to impeaching the credibility of a government witness where that information is favorable and material to guilt or punishment."  <u>Roe v. Lynch</u>, 997 F.3d 80, 82 (1st Cir. 2021) (citing <u>Giglio</u>, 405 U.S. at 154-55).  The Local Rules provide for production of impeachment

---

[62]    In the event this assumption is inaccurate, defendants may renew request 32.

material 21 days prior to trial.  <u>See</u> L.R. 116.2(b)(2)(A)
(requiring production 21 days before trial for "information that
tends to cast doubt on the credibility or accuracy of any
witness").

Here, defendants' first reason for immediate production
(Agent Jacobsen's "incredible power" by inventing the crime) is
unconvincing as a basis to require immediate production under
<u>Brady</u>.  The second reason is not convincing because the factual
mistakes are relatively minor and Agent Jacobsen corrected a
number of them in the January 31, 2020 affidavit.  Overall,
requiring *immediate* production of <u>Giglio</u> material with regard to
Agent Jacobsen appears insufficient to place the "record in 'such
a different light as to undermine confidence in the verdict.'"
<u>Paladin</u>, 748 F.3d at 444 (citation omitted).  Delaying production
until 21 days prior to trial will not prevent defendants from
using the 21-day produced impeachment material effectively to
prepare and present their case at trial.  <u>See</u> <u>United States v.
Montoya</u>, 844 F.3d 63, 71 (1st Cir. 2016) (whether timing of a
delayed disclosure violates <u>Brady</u> implicates whether delay
"inhibited the defendant from using the disclosed material
effectively"); <u>accord</u> <u>United States v. Kifwa</u>, 868 F.3d 55, 60
(1st Cir. 2017); <u>United States v. Rodriguez-Berrios</u>, 359 F. Supp.
2d 34, 37 (D.P.R. 2005) (as to "timing of *Brady–Giglio*
disclosures, 'the test is whether'" delay prevented defendant

94

"'from using the disclosed material effectively in preparing and presenting the defendant's case'") (quoting <u>United States v. Villarman-Oviedo</u>, 325 F.3d 1, 13 (1st Cir. 2003)).  Out of an abundance of caution, however, the government is instructed: (1) to review in the next two weeks the requested <u>Giglio</u> material with regard to Agent Jacobsen to determine if the requested information is favorable and material impeachment information subject to immediate disclosure under <u>Brady</u>; and (2) produce any such favorable and material information to defendants within one week of the government's determination that the information is, in fact, favorable and material under <u>Brady</u>.  <u>See</u> <u>generally</u> <u>Prochilo</u>, 629 F.3d at 268.

C.  <u>Information Regarding the CI (¶¶ 36-49)</u>[63]

Requests 36 to 49 seek information regarding the CI, albeit not his or her identity.  (Docket Entry # 182, p. 35, n.17).  In seeking disclosure, defendants assert the information or documents are favorable and material under <u>Brady</u> and material to prepare their defense under Rule 16(a)(1)(E)(i).  (Docket Entry # 182, pp. 33-40).  Specifically, defendants submit the information and documents are critical to their "defenses of entrapment, outrageous government misconduct, selective enforcement and prosecution, [and] vindictive prosecution," which they outline in

---

[63]  The 14 individual requests in this category are set out in defendants' motion (Docket Entry # 182, pp. 34-35) and need not be repeated.

general relative to the CI.[64]   (Docket Entry # 182, p. 33-40).

Defendants maintain the information is necessary "whether or not

the government intends to call the CI as a trial witness."

(Docket Entry # 182, pp. 35-36).  At the hearing, defendants

emphasized the need for the information to show the CI's motive

of why he went to the ATF.  Consistent with a statement in their

brief that they are not requesting the CI's identity (Docket

Entry # 182, p. 35, n.17), defendants elaborated at the hearing

that they are not interested in the identity of the CI because

they know the identity.

    The government "declines to produce the information at this

time in light of the violent nature of the charged crimes and the

defendants' violent criminal histories."  (Docket Entry # 182-1,

p. 5).  According to the government, the information requested

"is singular enough that it could be used as proof of the [CI's]

identity sufficient for somebody acting in behalf of one or both

of the defendants to cause harm or worse to the [CI]."  (Docket

Entry # 190, p. 55).  To support the position that disclosure of

the requested communications will endanger the CI "at this time,"

the government requested and this court allowed the filing of

information ex parte and under seal to support this position.

---

    [64] Although defendants refer in passing to the need for the
information to prepare "pre-trial motions to suppress evidence"
(Docket Entry # 182, p. 33), they do not develop and therefore
waive this argument with respect to requests 36 to 49.  See
Oladosu, 744 F.3d at 39.

Except for the government's argument relative to requests 48 and 49 (Docket Entry # 190, p. 56), neither defendants nor the government separately address each of the 14 requests.[65]  The government's opposition does not affirmatively represent it will call the CI as a witness.  (Docket Entry # 190).

By way of background, the government disclosed the following regarding the CI:

> The [CI] has a criminal history that includes prior firearm and drug distribution convictions. On previous occasions, the [CI] has accurately identified and corroborated events and individuals involved in active criminal investigations. At the direction of law enforcement, the [CI] has conducted controlled purchases of evidence in conjunction with criminal investigations. The [CI] is being paid for her/his services and information provided.

(Docket Entry # 182-4, p. 5, n.1).  The 14 requests globally seek information and documents not only regarding the CI's cooperation and communications in this case but also in all other cases.  For example, request 37 seeks documents "concerning promises, rewards, or inducements from law enforcement or prosecuting authorities to the CI or third parties for the benefit of the CI" (Docket Entry # 168, ¶ 37) without limiting the request to "this investigation," as is done in requests 45 and 46 (Docket Entry # 168, ¶¶ 45-46).  Similarly, request 41 seeks documents "comprising any periodic reviews of the CI's

---

[65]   The government's discovery letter additionally states that requests 44 to 47 seek information that is not discoverable or subject to production under the Jencks Act.  (Docket Entry # 182-1, p. 5).

status" and request 38 seeks documents "comprising agreements between the CI and law enforcement agencies or prosecuting authorities" (Docket Entry # 168, ¶¶ 38, 41) without limiting the requests to this case or this investigation.

Under Roviaro v. United States, 353 U.S. 53, 59-60 (1957), "[t]he government has a qualified privilege to withhold the identity of people who provide law enforcement officers information about criminal acts." United States v. Moon, 802 F.3d 135, 150 (1st Cir. 2015) (citing Roviaro, 353 U.S. at 59-60, and United States v. Mills, 710 F.3d 5, 13 (1st Cir. 2013)). Notably for present purposes, "[i]f disclosure of other materials will also tend to reveal the source's identity, the contents of those materials are also privileged." Monell, 2013 WL 12437912, at *3 (citation omitted). Defendants' contention that the "'informer's privilege'" under Roviaro "does not apply" because they are not requesting the CI's identity (Docket Entry # 182, p. 35, n.17) is therefore mistaken. Indeed, as explained by the First Circuit, "Roviaro makes clear that, if disclosure of a communication's contents will also tend to reveal an informant's identity, the contents are also privileged." United States v. Cartagena, 593 F.3d 104, 113 (1st Cir. 2010) (emphasis added).

As noted, the privilege is qualified as opposed to absolute. Id. at 112-113. When "'the disclosure of an informant's identity, or of the contents of his communication, is relevant

and helpful to the defense of an accused, or is essential to a
fair determination of a cause, the privilege must give way.'"
Id. at 113 (quoting Roviaro, 353 U.S. at 60-61); accord Moon, 802
F.3d at 150 ("court must determine whether" disclosing identity
"is 'relevant and helpful to the defense' or 'essential to a fair
determination of a ca[se]'") (quoting Roviaro, 353 U.S. at 60-
61).  The requisite analysis starts "with a presumption in favor
of confidentiality" and requires a trial court to "'balance the
accused's right to prepare and present his defense against the
public interest in acquiring needed information and the
informant's stake in confidentiality.'"  Mills, 710 F.3d at 14
(internal brackets and citation omitted).  "Other factors that
typically go into the mix include 'the nature of the crime
charged, the contours of the defenses asserted, the available
means of proving the charges and defenses, and the significance
of the informant's role.'"  Id. (internal citation omitted);
accord Moon, 802 F.3d at 151 (proper balance takes "'into
consideration the crime charged, the possible defenses, the
possible significance of the informer's testimony, and other
relevant factors'") (quoting Roviaro, 353 U.S. at 62).

   The defendant has the burden "to show that disclosure is
essential for an adequate defense—and it is a 'heavy' one."
Mills, 710 F.3d at 14 (emphasis added); accord United States v.
Perez, 299 F.3d 1, 4 (1st Cir. 2002) (defendant must "demonstrate

that knowledge of" confidential informant's identity "is vital to the proper preparation and presentation of his case"). Conversely, irrelevant or "nonessential 'evidence'" falls well within the protection of the privilege. Mills, 710 F.3d at 13-14 (noting that Roviaro "Court could not have meant 'that the privilege covers only irrelevant and unhelpful' or nonessential 'evidence'") (quoting United States v. Gaston, 357 F.3d 77, 84 (D.C. Cir. 2004)). Speculation about the usefulness of information or communications that will tend to reveal an informant's identity "falls short of meeting" defendants' burden. Cartagena, 593 F.3d at 114. Rather, defendants must point "to concrete facts" to support "the conclusion that disclosure" will aid their defense of entrapment or the other above-noted defenses they enumerate to support disclosure. Id. The burden is nevertheless not insurmountable. See Mills, 710 F.3d at 14. For example, a "court may order disclosure" when "the informant is the sole participant, other than the accused, in the transaction charged or if the informant is the only person who is in a position to amplify or contradict crucial testimony of government witnesses." United States v. Robinson, 144 F.3d 104, 106 (1st Cir. 1998); accord Mills, 710 F.3d at 14. The overall "inquiry is case-specific," Moon, 802 F.3d at 151, and therefore depends on "the particular circumstances of each case." Perez, 299 F.3d at 4.

100

In the case at bar, the CI played a direct and prominent role in initiating the investigation (Docket Entry # 182-4, ¶¶ 6, 9, 13) (Docket Entry # 182-3, ¶¶ 19-21) and thereafter participated in the events which culminated in defendants' arrests on January 28, 2020.  Significantly, the CI provided the initial information to Agent Jacobsen that Cousin was actively requesting people to "locate drug dealers with stash-houses in possession of money and narcotics, and to report back to" him (Docket Entry # 182-4, ¶ 6) and that Cousin requested the CI "to make such a phone call" (Docket Entry # 182-4, ¶ 9).  The CI also informed Agent Jacobsen that Cousin was "casing potential targets for robberies."  (Docket Entry # 182-4, ¶ 9).  This information is relevant and helpful to assess Cousin's predisposition because the described conduct took place prior to any government-initiated contact, concerns potential crimes similar to the charged offenses, and is temporally close in time to the charged offenses.  In addition, the information contributed to the ATF initiating this case which, in turn, led to the charges against Perry.  (Docket Entry # 182-2, ¶ 12) (Docket Entry # 182-4, ¶¶ 6, 9).  The accuracy and reliability of the CI's information is fundamental to a fair determination of Cousin's predisposition to commit the charged offenses and his entrapment defense.  Hence, irrespective of whether the CI testifies as a government witness, the existence of any promises, rewards, and inducements as well

101

as the contours of any cooperation agreement are relevant,
helpful, and essential to assess the credibility of the CI and,
specifically, the accuracy of this initial information to
determine Cousin's predisposition regarding the entrapment
defense.[66]  Requests 37 and 38 seek such information.[67]  The CI's
criminal history, limited to open federal cases and sentences
being served on release during the January 28, 2019 to January
28, 2020, is essential for the same reasons.  Request 36 asks for
the CI's criminal history.

Juxtaposed against this showing, the government's ex parte,
sealed filing is concerning and indicative of a concrete and
viable risk of potential harm to the CI.  The government also
takes the reasonable position that the requested information
regarding the CI will provide "*proof* of the [CI's] identity."
(Docket Entry # 190, p. 55) (emphasis added).  At the hearing,
defendants' counsel stated that they knew the identity of the CI,
but counsel did not explain how they knew his or her identity or

---

[66]   Although the government disclosed that the CI "is being
paid for his/her services and information," the government did
not disclose the amount and size of the payment.

[67]   Request 37 seeks the following: "All information and all
documents concerning any monetary payments or other promises,
rewards, or inducements from law enforcement or prosecuting
authorities to the CI or third parties for the benefit of the
CI."  (Docket Entry # 168, ¶ 37).  Request 38 asks for: "All
documents concerning or comprising agreements between the CI and
law enforcement agencies or prosecuting authorities."  (Docket
Entry # 168, ¶ 38).

provide additional information or refer to material confirming the identity.  Given the circumstances, the identity of the CI is not definitely known or confirmed by the government.  Nor has the CI's identity been disclosed.  The disclosure of the communications will, as reasonably posited by the government, "be used as proof of the CI's identity."  (Docket Entry # 190, p. 55).

The safety concerns are nevertheless somewhat mitigated by the extent of defendants' knowledge and suspicions regarding the CI's identity.  See Pesaturo, 519 F. Supp. 2d at 186, 188 (defendant's knowledge of informant's identity for months without creating danger mitigates government's safety concerns).  A protective order limiting production to attorneys' eyes only without *any* disclosure to defendants or the public will adequately safeguard the CI while accommodating defendants' need for the above-noted relevant and helpful informant information. See id. at 187 (imposing protective order to protect confidential informant's identity from public); Fed. R. Crim. P. 16(d).  The protective order should also condition disclosure of the information to members of the defense team other than counsel of record by requiring the team member to execute a nondisclosure agreement.  It is suggested that filing any disclosed information on the docket be under seal absent a court order allowing public filing.

Having engaged in balancing the relevant factors in the particular circumstances of this case, the following requests fall outside the reach of the informer's privilege in <u>Roviaro</u>: request 36;[68] request 37 limited to information and documents concerning monetary payments or other promises, rewards, or inducements by the ATF to the CI or third parties for the benefit of the CI *in this case*; and request 38 limited to documents comprising cooperation agreements between the CI and the ATF or prosecuting authorities *in this case.*

Not only do the foregoing information and documents in these requests, as limited, fall outside the informer's privilege in <u>Roviaro</u>, but similar reasons render the information and documents in requests 37 and 38, as limited, exculpatory and material in connection with defendants' entrapment defense under <u>Brady</u>.[69] The court in <u>Pesaturo</u> concluded that information similar to the information defendants seek in requests 37 and 38, as limited, was subject to production under <u>Brady</u>.  See <u>Pesaturo</u>, 519 F. Supp. 2d at 189-192 (informant's cooperation agreement and any

---

[68]  Request 36 is limited to the CI's criminal history for the January 28, 2019 to January 28, 2020 time period for open federal cases, including convictions prior to imposition of sentences, and for federal sentences being served on release. The remaining criminal history of the CI falls within the scope of the informer's privilege and, as such, is not subject to production.

[69]  It is therefore not necessary to address whether the same information is subject to production as "material to preparing the defense" under Rule 16(a)(1)(E)(i).

promises, rewards, or inducements made to informant with respect

to the prosecution of the defendant in that case constitute <u>Brady</u>

material).[70]  As cogently explained in <u>Pesaturo</u>:

> The informant's cooperation agreement (as well as any
> promises, rewards or inducements made to him) are
> exculpatory under *Brady* and material to the preparation of
> the Defendant's defense within the meaning of Rule 16. The
> information concerning the informant's cooperation with the
> Government is significant and helpful to the Defendant in
> that it suggests a motive for him to engage in the improper
> conduct which the Defendant has alleged, under oath. It
> supports the Defendant's proffered entrapment defense, which
> itself attacks an essential element of the Government's
> case—i.e., the Defendant's state of mind. Without evidence
> of the terms of the informant's relationship with the
> Government, i.e. any evidence establishing the informant's
> motive, in this case, there is a reasonable probability of a
> different outcome. Thus, in light of the Defendant's
> entrapment defense, the information is exculpatory and
> material under *Brady* and material under Rule 16.

<u>Id.</u> at 191.

The criminal history defendants seek in request 36, as

limited, provides information that is helpful and material to

evaluate the accuracy of the CI's initial information that Cousin

was actively requesting people to locate drug dealers with stash

houses and requested the CI "to make such a phone call" (Docket

Entry # 182-4, ¶ 9).  Federal charges during this time period

provide a motive for the CI to curry favor with the government

that impacts directly the CI's credibility in providing this

---

[70]  The court in <u>Pesaturo</u> also determined that the request
for materials concerning the informant's cooperation in *other
cases* was not exculpatory under <u>Brady</u> or "'material to the
preparation of the defense'" under Rule 16(a)(1)(E)(i).
<u>Pesaturo</u>, 519 F. Supp. 2d at 192.

important information relative to Cousin's entrapment defense.
Accordingly, request 36, as limited, is subject to disclosure
under Rule 16(a)(1)(E)(i).[71]  See also Pesaturo, 519 F. Supp. 2d
at 191.

The information and documents requested in the remaining
requests (as well as the information and documents in requests 36
to 38 which lie outside the foregoing limitations) are not
essential to developing the entrapment defense (or any of the
above-noted defenses) due in part to the production ordered
above.  See generally Mills, 710 F.3d at 14 (factors to consider
in ordering disclosure include "'available means of proving the .
. . defenses"); id. at 13-14 (Roviaro "Court could not have meant
. . . 'privilege covers only' . . . nonessential 'evidence'")
(citation omitted).  Moreover, the government's production to
date of information and documents to defendants provides them
with a means to support the forgoing defenses of entrapment,
outrageous government conduct, selective enforcement and
prosecution, and vindictive prosecution.  Relatedly, the
information and documents sought in the remaining requests, such
as "documents and information concerning or comprising periodic
reviews of the CI's status" (Docket Entry # 168, ¶ 41), are

---

[71]   It is therefore not necessary to address whether the
same information is subject to production under Brady.  Local
Rule 116.1(c)(1)(A) requires immediate production of the
information.

unlikely to significantly impact the contours of these defenses.
Additional disclosures, even if subject to a protective order,
will only increase the likelihood of proving the CI's identity
and raise the risk of potential harm.  The public also has an
"interest in encouraging the flow of [needed] information."
United States v. Estrella, 567 F.2d 1151, 1153 (1st Cir. 1977)
(citing Roviaro, 353 U.S. at 62); accord Mills, 710 F.3d at 14
(balancing "public interest in acquiring needed information");
see also Roviaro, 353 U.S. at 59 (purpose of privilege protects
"the public interest in effective law enforcement").  The
remaining requests, as well as the information and documents that
lie outside the above limitations imposed on requests 36 to 38,
fall within the scope of the informer's privilege under Roviaro.

In the alternative, defendants fail in their burden to show
that the documents and information sought in these remaining
requests or that lie outside the limitations imposed on requests
36 to 38 are material under Brady or material to the preparation
of their defense under Rule 16(a)(1)(E)(i).  For example, request
49[72] seeks information known to Cousin.  See Bender, 304 F.3d at
164 (Brady applies only to material "unknown to the defense").
The request also seeks speculative information which is not
subject to production under Rule 16(a)(1)(E)(i).  See United
States v. Salinas-Acevedo, 863 F.3d 13, 19 n.4 (1st Cir. 2017)

---

[72]   See footnote 17.

("inferential leap that Rullán-Santiago possessed some sort of 'contempt' or was out to get Salinas-Acevedo" in light of Salinas-Acevedo's referring to Rullán-Santiago "as a 'dog'" is "speculative"); see generally Goris, 876 F.3d at 45 (district court's denial of discovery request as grounded in "speculative theory . . . is not an abuse of discretion").

CONCLUSION

The motion to compel (Docket Entry # 182) is **ALLOWED** in part and **DENIED** in part.  The above-noted information and documents in requests 36, 37, and 38, as limited, is subject to production under a protective order strictly limiting disclosure to the individual attorneys designated as current counsel of record for defendants.  The parties shall prepare and file a proposed protective order consistent with this opinion on or before February 17, 2022.  As instructed in this opinion, the government is under an obligation to review certain information to determine if it is exculpatory and material under Brady and produce such information in the event it is exculpatory and material.


   /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge